RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0287p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

SHEILA MCCULLUM, Individually and as
Administratrix of the Estate of Timothy
Hughes,

               *Plaintiff-Appellee*,

     *v.*

KENNETH TEPE,

               *Defendant-Appellant*,

BUTLER COUNTY, OHIO; BUTLER COUNTY
BOARD OF COMMISSIONERS; RICHARD K.
JONES; LEAH JOHNSON; THERESA DIETZ,
Sergeant; JANE OR JOHN DOE #1; WILLIAM
ROGERS; RESOLUTIONS COMMUNITY
SOLUTIONS, INC.; COMMUNITY BEHAVIORAL
HEALTH, INC.,

               *Defendants.*

> No. 11-3424

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:08-cv-387—Timothy S. Black, District Judge.

Argued: July 24, 2012

Decided and Filed: August 28, 2012

Before: BOGGS, GILMAN, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David C. Calderhead, CALDERHEAD, LOCKEMEYER & PESCHKE
LAW OFFICE, Milford, Ohio, for Appellant. Jennifer L. Branch, GERHARDSTEIN
& BRANCH CO. LPA, Cincinnati, Ohio, for Appellee. **ON BRIEF:** David C.
Calderhead, Joshua F. DeBra, Joel L. Peschke, CALDERHEAD, LOCKEMEYER &
PESCHKE LAW OFFICE, Milford, Ohio, for Appellant. Jennifer L. Branch, Alphonse
A. Gerhardstein, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, for
Appellee.

1

————————————

**OPINION**

————————————

BOGGS, Circuit Judge.  Timothy Hughes died after hanging himself from his bed in the Butler County Prison.  Hughes showed no outward signs that he was suicidal, but he did have a history of depression and asked to see Dr. Kenneth Tepe, the prison psychiatrist, about anti-depression medication.  Hughes and Dr. Tepe never met. Hughes's mother filed this § 1983 suit, alleging that Tepe was deliberately indifferent to her son's serious medical need.  Tepe sought summary judgment, arguing that he was entitled to qualified immunity.  The district court held that Tepe could not assert a qualified-immunity defense.  We agree.  There does not seem to be a history of immunity from suit at common law for a privately paid physician working for the public, and the policy rationales that support qualified immunity are not so strong as to justify our ignoring this history, or lack of history.  We therefore affirm the district court's decision denying Tepe's request for qualified immunity.

I

Hughes, incarcerated in the Butler County Prison on charges of robbery, contributing to the delinquency of a minor, and abuse of the drugs cocaine and Concerta (a drug similar to Ritalin), hanged himself with a bed sheet.  He died the next day from his injuries.  Sheila McCullum, Hughes's mother, sued, seeking damages against Tepe, *inter alia*.[1]

Tepe had provided psychiatric services to inmates of the Butler County Prison for approximately ten years.  Until 2005, the County paid Tepe directly.  At the time of Hughes's suicide, however, Tepe worked for Community Behavioral Health, a non-profit entity that provides crisis counseling, mental-health screening and mental-health

---

[1]McCullum also sued a social worker who had met with Hughes about his psychiatric needs, the non-profit organization that employed both Tepe and the social worker, Butler County, the physician in charge of medical services in the prison, and other prison personnel involved in the events that led to Hughes's death.

assessments for Butler County Prison inmates. The Prison's psychiatric-services program, which Tepe designed, had two steps. First, a social worker would conduct "triage," deciding which inmates Tepe should see. Then, if the social worker so recommended, the inmate would meet with Tepe in person. Tepe spent approximately two hours each Tuesday morning at the Prison, and was on call twenty-four hours a day.

Hughes arrived at the Prison on March 14, 2007. He told the officer booking him that he had attempted suicide within the last year and that, in the past, he had been hospitalized for suicidal ideation. Hughes, however, also told the officer that he was not currently contemplating suicide. In response, a prison social worker put a suicide alert for Hughes in the Prison's computer system. Ten days later, on March 24, a paramedic conducting a routine medical screening noted that Hughes had a history of depression and that he had not taken Seroquel, his prescribed medication, in over a year. She therefore declined to approve Hughes for a food-service job. Nevertheless, the paramedic wrote that Hughes had "no medical complaints at this time" and decided not to refer him to a doctor.

On the same day, Hughes filled out an "inmate service request," asking to "talk to Dr. Tepe about geting [sic] back on my Depression and bipolar meds." Hughes elaborated: "I didn't relize [sic] that when I took my selfe [sic] of [sic] I didn't need them. But now I know I think I need them again." Social worker Leah Johnson[2] reviewed Hughes's request on March 27 and spoke to Hughes in person. During their conversation, Hughes was "comfortable [and] jovial" and "joked with [Johnson]." According to Johnson's contemporaneous report,[3] Hughes explained that he had not taken his medication for more than a year, opting instead to medicate himself with

---

[2]Johnson is a licensed social worker. Under Ohio law, she cannot diagnose patients, develop treatment plans, or provide counseling without clinical supervision by a physician or licensed independent social worker. Although both Tepe and licensed-social-worker Chris Connolly—who was also the Assistant Vice President of Community Behavioral Health—supervised Johnson, Tepe took responsibility for overseeing any decisions she made about medications. Tepe did not review Johnson's determinations that a patient should not see him.

[3]After Hughes's suicide, Johnson wrote a more detailed report. For our purposes, detailed discussion of this document is not necessary.

marijuana, alcohol, and cocaine.**[4]** Johnson's report also noted that Hughes did not display any psychosis and denied having any suicidal ideation. Johnson declined Hughes's request to see Tepe.

A number of family members visited Hughes in the days that followed. None believed that he was suicidal. On April 6, Hughes had an altercation with his cell-mate. He filed charges against the cell-mate, and charges were filed against him. In the aftermath of this incident, Hughes met with a sergeant. During that meeting, Hughes denied that he was thinking about committing, or planning to commit, suicide.

The sergeant put Hughes in an isolation cell where, late in the evening, he wrote letters to family members. Hughes's first letter, addressed to his father, expressed anger at being "put in the hole" because his cell-mate hit him. "Wats [sic] fucked up the most," Hughes wrote, "is I dident [sic] even set to hit [him] back and they still put me in the hole this is bull shit." Hughes concluded by writing: "I love and miss you so much . . . P.S. write back and send pictures please." The second letter that Hughes wrote was to his mother. He asked that she "get that lawyer now" because of the fight, and again expressed anger that his cell-mate "hit me and I go to the hole." In a third letter, also to his mother, Hughes wrote: "Thank you and grandma for every thang [sic] you all have done and will do for me when I get out. I will need everyones [sic] help to stay off the drugs. And stay away from all my old friends that I got them from . . . I cant [sic] wait to come home." Hughes's last letter was to his grandmother. He apologized for making her worry and "promis[ed] to stairtin [sic] my life up when I get out and get a good job. And quit doing drugs and stealing." He concluded: "I love you so much and I wish I would have listened to you along [sic] time ago but I could'ent [sic] cause of the drugs. And I'm sorry for that . . . P.S. Please write me back. I Love You So much and miss you."

---

**[4]**Johnson's longer report indicates that, when she told Hughes that he could not immediately get Seroquel because he had not been treated by a physician within the last year, he claimed still to be taking the drug. Hughes told Johnson that he had been purchasing Seroquel illegally from a friend who had a prescription.

The next day, Hughes hanged himself from the side of his bunk with a bedsheet. He died the following day, April 8, in the hospital. Hughes did not leave a suicide note. Nor did he ever see Tepe.

McCullum, Hughes's mother, filed this § 1983 suit against Community Behavioral Health, an organization related to Community Behavioral Health called Resolutions, and Tepe just under two years later on March 27, 2009.[5] She alleged that the defendants were liable under § 1983 for deliberate indifference to Hughes's serious medical need, to wit: a suicidal tendency. McCullum also made a wrongful-death claim under Ohio law. On December 1, 2010, Tepe moved for summary judgment on qualified-immunity grounds and other grounds not relevant here. The district court held that Tepe was not entitled to qualified immunity. It first noted that Tepe was not a government official automatically entitled to invoke the doctrine. The district court then found that Tepe could not claim qualified immunity as a private actor performing a government function because he could show neither: (1) a firmly rooted tradition of immunity applicable to private defendants like him at common law; nor (2) that the purposes underlying the doctrine of qualified immunity supported immunity in his case. Tepe appeals.

II

Title 42 U.S.C. § 1983 creates a private right of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Liability, though, is not automatic, even when an official act violates the Constitution. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). When a district

---

[5]On December 9, 2009, the district court consolidated the suit with another suit that McCullum had filed earlier against various other Prison personnel involved in the events described above.

court denies qualified immunity, we review its legal conclusions *de novo*. *Grawey v. Drury*, 567 F.3d 302, 310 (6th Cir. 2009).**6**

The issue in this appeal is whether Tepe, a physician employed by an independent non-profit organization, but working part-time for the County as a prison psychiatrist, can invoke qualified immunity in a lawsuit arising out of his activities at the prison. A physician who contracts to provide medical services to prison inmates, the Supreme Court has held, acts under color of state law for purposes of § 1983. *West v. Atkins*, 487 U.S. 42, 54 (1988). But a party is not entitled to assert qualified immunity simply because he is amenable to suit under § 1983. *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008).

Section 1983 "creates a species of tort liability that on its face admits on no immunities." *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976). The Supreme Court, however, has "accorded certain government officials either absolute or qualified immunity from suit if the tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine." *Wyatt v. Cole*, 504 U.S. 158, 163–64 (1992) (internal quotation marks omitted). Thus, if a party seeking immunity would have been "shielded from tort liability when Congress enacted the Civil Rights Act of 1871—§ 1 of which is codified at 42 U.S.C. § 1983—we infer from legislative silence that Congress did not intend to abrogate such immunities when it imposed liability for actions taken under color of state law." *Id.* at 164. But even with such an inference, and "irrespective of the common law support, we will not recognize an immunity available at common law if § 1983's history or purpose counsel against applying it in § 1983 actions." *Ibid.* Thus, when a private party—including a private person working for the government part-time, *Filarsky v. Delia*, 132 S. Ct. 1657, 1667–68 (2012)—seeks qualified immunity from a § 1983 suit, we determine whether: (1) there was a firmly rooted history of immunity for similarly situated parties at common law; and (2) whether

---

**6**When reviewing the denial of a motion for qualified immunity, questions of fact are beyond the scope of our review. *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995). Because the facts relevant to our analysis are not in dispute, *Johnson* has no impact here.

granting immunity would be consistent with the history and purpose of § 1983. *See id.* at 1662 (explaining that, to determine whether a party may assert qualified immunity, "we look to the 'general principles of tort immunities and defenses' applicable at common law, and the reasons we have afforded protection from suit under § 1983" (quoting *Imbler*, 424 U.S. at 418)); *Richardson v. McKnight*, 521 U.S. 399, 404 (1997) (noting that, to determine whether prison guards employed by a private corporation were entitled to qualified immunity, the Court would "look both to history and to the purposes that underlie government employee immunity").[7] We address each question in turn.

A

In *Richardson*, the Supreme Court held that privately employed prison guards could not assert qualified immunity. The Court also noted, however, that "[a]pparently the [common] law did provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign." *Id.* at 407. For this proposition, it cited *Tower v. Glover*, 467 U.S. 914, 921 (1984), which dealt with qualified immunity for public defenders, and Joel Prentiss Bishop, Commentaries on Non-Contract Law (1889), which suggested that, at common law, a physician was subject to the same immunity rules as a barrister, and that an action for damages could not lie against a barrister because his services were considered "honorary."[8] *Id.* §§ 704,

---

[7] As a recent commentator observed, the Supreme Court has not specified "whether policy and history form a conjunctive or disjunctive test, instead leaving their roles uncertain." *Developments in the Law—State Action and the Public/Private Distinction, III. Private Party Immunity from Section 1983 Suits*, 123 Harv. L. Rev. 1266, 1271 (2010). Although *Wyatt*'s plain language points to a conjunctive test, *see* 504 U.S. at 164, *Richardson* analyzed policy concerns, even after concluding that "history [did] not provide significant support for the [defendants'] immunity claim." 521 U.S. at 407; *id.* at 407–412. We follow *Richardson* out of an abundance of caution. But it may be questionable whether the Supreme Court's jurisprudence in this area would allow a court to extend qualified immunity where there was no history of immunity at common law, even if sound policy justified the extension.

[8] "Professing to follow the example of the Roman Orators, English Barristers and Serjeants did not demand compensation, as a matter of right. When they accepted a fee, they did not receive it as an equivalent for services rendered, but as a gratuity, or an honorary gift." *Seeley v. Crane*, 15 N.J.L., 1835 WL 2033, at *2 (N.J. 1835). Physicians were on the same footing. As Lord Chief Justice Kenyon explained in *Chorley v. Boclot*, (1791) 100 Eng. Rep. 1040, 1041 (K.B.), "it has been understood in this country that the fees of a physician are honorary, and not demandable of right; and it is much more for the credit and rank of that honourable body."

708. Neither the Bishop treatise nor the Supreme Court cited any case law suggesting that a doctor would have been immune from an action for damages at common law.[9]

Soon after *Richardson*, the Eleventh Circuit decided that a prison physician working for a private company could not assert qualified immunity against a § 1983 deliberate-indifference claim. *Hinson v. Edmond*, 192 F.3d 1342, 1347 (11th Cir. 1999). "The parties," the court began, "have not been able to point to, and independent research—including a look at the sources cited by the Supreme Court in *Richardson*—does not reveal, cases which show a common law tradition of immunity from liability for privately employed prison physicians for acts amounting to recklessness or intentional wrongdoing." *Id.* at 1345. The court, citing Georgia law from the mid-Twentieth Century, continued: "Instead, case law shows that even state physicians may be subject to liability for intentional torts." *Ibid.* Similarly, in *Jensen v. Lane County*, 222 F.3d 570, 577 (9th Cir. 2000), the Ninth Circuit held that a doctor accused of wrongfully committing a patient to a mental hospital could not claim qualified immunity because there was no common-law history of immunity for such an act. Like *Hinson*, *Jensen* cited no pre-Twentieth Century case or treatise to support its holding, relying instead on Oregon cases and statutes from after 1950.

We cited both *Hinson* and *Jensen* with approval in our published *Harrison* opinion, relying on both for the conclusion "that there is no 'firmly rooted' common law practice of extending immunity to private [nurses working at a county jail]." 539 F.3d at 522. Likewise, our unpublished opinion in *Cook v. Martin*, 148 F. App'x 327, 340–41 (6th Cir. 2005), relied on *Hinson* and *Jenson* to bolster its conclusion that there was no firmly rooted tradition of immunity at common law for a private physician's assistant working in a public jail.

---

[9] Bishop's text read: "Probably, within the rule applicable to barristers, [a physician] was not liable civilly for the consequences of simple negligence or want of skill; hence the English reports furnish us no precedents on our present subject, as to licensed physicians." Bishop, *Commentaries* § 708. Bishop was mistaken. As the cases cited below illustrate, physicians were held civilly liable in England as early as the mid 1300's.

After *Filarsky*, however, *Hinson* and *Jenson*'s historical analyses—which rested on Twentieth Century law—are suspect, at best. *Filarsky*, 132 S. Ct. at 1660, addressed the question whether an attorney who worked for a city part-time could assert qualified immunity. It held that he could. *Id.* at 1668. Although *Filarsky* dealt with a lawyer, not a doctor, it is relevant here because it shows us how to determine whether there was a history of immunity for a particular kind of actor at common law. *Id.* at 1662–65. *Filarsky*'s history section focused on the state of the law around the time when Congress enacted § 1983. Indeed, the Court did not cite one case decided after 1900 to support its historical analysis. And while *Filarsky* did not impose a rigid date limit, it does illustrate the scope of the relevant inquiry: whether a person in the same position as the party asserting qualified immunity would have been immune from liability under the common law of the late Nineteenth Century. *See id.* at 1662 ("Under our precedent, the inquiry begins with the common law as it existed when Congress passed § 1983 in 1871."); *Wyatt*, 504 U.S. at 164 ("If parties seeking immunity were shielded from tort liability when Congress enacted the Civil Rights Act of 1871—§ 1 of which is codified at 42 U.S.C. § 1983—we infer from legislative silence that Congress did not intend to abrogate such immunities when it imposed liability for actions taken under color of state law.").

With this in mind, we consider whether a private doctor working for a state institution would have been immune from a suit for damages at common law.[10] In England, "*mala praxis* [was] a great misdemesnor [sic] and offence at common law, whether it be for curiosity and experiment or by neglect;[11] because it breaks the trust which the party had placed in his physician, and tends to the patient's destruction." 4 William Blackstone, Commentaries, *122; *see also Dr. Groenvelt's Case*, (1697) 91 Eng. Rep. 1038 (K.B.) (discussing the case a of doctor imprisoned for malpractice); Andrew A. Sandor, *The History of Professional Liability Suits in the United States*,

---

[10]*Harrison* and *Cook* are not particularly helpful because neither involved a doctor. The former involved private nurses; the latter, private physician's assistants. Furthermore, both relied uncritically on cases analyzing law that postdated the passage of § 1983 by seventy-five to one hundred years.

[11]This observation casts doubt on cases like *Hinson* that distinguish between a suit against a doctor for negligence and a suit against a doctor involving a more culpable mental state.

163 J. Am. Med. Ass'n 459, 459 (1957) (citing English civil medical-malpractice cases decided as early as 1374).  Bishop is correct that there is little British civil-malpractice case law.  However, contrary to Bishop's unsupported speculation, it does not appear that doctors generally enjoyed any special kind of immunity.  *See* Sandor, *supra,* at 459 (collecting cases).

The first reported American medical-malpractice case appears to be *Cross v. Guthery*, 2 Root 90, 1794 WL 198 (Conn. Super. 1794).  There, a man retained a doctor to perform surgery on a tumor in his wife's breast.  The doctor "promised to perform [the] operation with skill and safety to the wife of the plaintiff," but instead "performed said operation in the most unskillful, ignorant and cruel manner, contrary to all the well-known rules and principles of practice in such cases; and . . . after said operation, the plaintiff's wife languished for about three hours and then died of the wound given by the hand of the defendant."  *Id.* at *1.  The plaintiff recovered forty pounds for the loss "of the service, company and consortship of his said wife."  *Ibid.*  Although the doctor defended vigorously, he did not argue that he was immune from damages because he was a doctor.

But the doctor in *Cross* was a private doctor working for a private client.  Tepe was a private doctor working for a public institution.  Hence, the question: even if doctors generally had no immunity at common law, what of a private doctor who, like Tepe, worked for the government?  There is little directly applicable case law.  But the precedents that do exist point in one direction: there was no special immunity for a doctor working for the state.

In *Landon v. Humphrey*, 9 Conn. 209, 1832 WL 76, at *1 (Conn. June 1832), a doctor contracted with the town of Salisbury to vaccinate residents against "small or kine pox."  The doctor, or his agent,[12] "so unfaithfully, unskillfully and ignorantly treated the plaintiff, that he cut a tendon, cord, ligament and nerve of the plaintiff's arm and inoculated her in an improper, unusual and dangerous place on her arm."  *Ibid.*  The

---

[12]It appears that the doctor's agent actually caused the plaintiff's injury, but the court still analyzed the case in terms of the doctor's lack of due care in administering the vaccination.

plaintiff won damages at trial, and the Supreme Court of Errors of Connecticut affirmed. The defendant raised a number of objections, but neither he nor the court mentioned immunity. Similarly, the Kentucky Court of Appeals—Kentucky's highest court until 1976—affirmed a money judgment against a doctor, hired "at the instance of a neighboring justice of the peace, acting for the county . . . [and] under instructions to give his patient all necessary attention, but not to run the county to unnecessary expense." *Williams v. Nally*, 45 S.W. 874, 874 (Ky. Ct. App. 1898). The doctor had treated a man with a broken leg, but "because the wound was unskillfully attended to . . . gangrene set up in the foot of the patient, and amputation of his leg became necessary." *Ibid.* The doctor defended by arguing that a number of jurors were biased and that the plaintiff was responsible for the gangrene because he failed to follow instructions. But neither the doctor nor the court mentioned immunity. Last is *DuBois v. Decker*, 29 N.E. 313 (N.Y. 1891). There, a man

> undertook to jump onto an engine of the Ulster and Delaware railroad, in the city of Kingston, and in doing so slipped, and his left foot was caught by a tender and a portion thereof crushed. Being destitute, he was taken to the city alms-house, where he was treated by . . . one of the city physicians having the care of the patients therein . . . . Thereafter . . . [the physician] amputated the plaintiff's leg above the ankle joint, and six or seven days thereafter, gangrene having set in, he again amputated the leg at the knee joint. After the second amputation the leg did not properly heal, but became a running sore, and at the time of the trial the bone protruded some three or four inches.

*Id.* at 314. The physician defended on a variety of grounds, including the principle that a doctor could not be liable for an error in judgment, the lower court's decision not to issue a favorable jury instruction, *ibid.*, and a number of evidentiary decisions at trial, *id.* at 315. The doctor also asserted that, because he "treated the plaintiff gratuitously, he is liable, if at all, only for gross negligence; which was refused." *Ibid.* The court responded:

> It has been held that the fact that a physician or surgeon renders services gratuitously does not affect his duty to exercise reasonable and ordinary care, skill and diligence.

> But we do not deem it necessary to consider or determine this question for it appears that the plaintiff's services were not gratuitously rendered. He was employed by the city as one of the physicians to attend and treat the patients that should be sent to the alms-house. *The fact that he was paid by the city instead of the plaintiff did not relieve him from the duty to exercise ordinary care and skill.*

*Ibid.* (emphasis added). This last sentence is suggestive. The doctor in *DuBois* would have had a *stronger* claim to immunity than Tepe: the city, not a private company, paid his wage. Still, the doctor did not raise, and the court did not mention, immunity. Rather, the court held that, regardless of who paid the doctor, the standard of care was the same, and affirmed a money judgment in favor of the plaintiff.

These cases, as well as the American and English cases involving private physicians in private practice, and the absence of any indicia that a paid physician (whether remunerated from the public or private fisc) would have been immune from suit at common law, convince us that there was no common-law tradition of immunity for a private doctor working for a public institution at the time that Congress passed § 1983. The first piece of the *Richardson* analysis, then, suggests that we should not allow Tepe to assert qualified immunity.

B

The policy element of our analysis hinges on three of § 1983's goals: (1) "protecting the public from unwarranted timidity on the part of public officials;" (2) "ensur[ing] that talented candidates were not deterred by the threat of damages suits from entering public service;" *Richardson*, 521 U.S. at 408, and (3) guarding against the distraction from job duties that lawsuits inevitably create. *Id.* at 411.

We acknowledge that it is somewhat odd for a government actor to lose the right to assert qualified immunity, not because his job changed, but because a private entity, rather than the government, issued his paycheck. But just as market pressures, a private firm's ability to "offset any increased employee liability risk with higher pay or extra benefits," *ibid.*, the "continual . . . need for deterring constitutional violations[,] and . . . [the] sense that the [private] firm's tasks are not enormously different in respect to their

importance from various other publicly important tasks carried out by private firms," *id.* at 412, vitiated any policy-based concerns in *Richardson*, these same factors suggest that immunity would be inappropriate here.  And, even if we could create an immunity not recognized at common law based on policy alone, *see supra* note 7, we would not do so here.

### III

Despite the Supreme Court's somewhat cryptic comment in *Richardson* that a doctor may have had immunity from damages at common law, there does not appear to be any history of immunity for a private doctor working for the government, and the policies that animate our qualified-immunity cases do not justify our creating an immunity unknown to the common law.  Thus, although we express no opinion on the ultimate validity of McCullum's claims, we AFFIRM the district court's conclusion that Tepe is not entitled to assert qualified immunity.