**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

SHAWNA TANNER, individually and as
personal representative of JAY HINTON,
JR.,

      Plaintiff - Appellant,

v.

TIMOTHY I. MCMURRAY, M.D.;
ADRIANA LUNA, R.N.; TAILEIGH
SANCHEZ, R.N.,

      Defendants - Appellees.

--------------------------------------------------

CORRECT CARE SOLUTIONS, LLC;
BOARD OF COUNTY
COMMISSIONERS OF BERNALILLO
COUNTY, New Mexico; ED KOSSMAN;
ELISA MANQUERO, R.N.; THOMAS J.
RUIZ; MARTINA SANCHEZ-FILFRED;
CHRISTOPHER MERCER; CLAUDIA
RODRIGUEZ-NUNEZ; TINA M.
MUNOZ,

      Defendants.

No. 19-2166

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:17-CV-00876-JB-JFR)**
_____

Jessica M. Hernandez (Paul J. Kennedy and Elizabeth A. Harrison with her on the briefs),
Kennedy, Hernandez & Associates, P.C., Albuquerque, New Mexico, for Appellant.

Jacob Z. Goldstein (Eric P. Schoonveld with him on the brief), Hall Prangle & Schoonveld, LLC, Chicago, Illinois, for Appellees.

_____

Before **MORITZ**, **EBEL**, Circuit Judges, and **LUCERO**, Senior Circuit Judge.

_____

**LUCERO**, Senior Circuit Judge.

_____

This appeal considers whether full-time employees of a for-profit, multi-state corporation organized to provide contract medical care in detention facilities may assert a qualified immunity defense to shield themselves from 42 U.S.C. § 1983 liability. Shawna Tanner, the plaintiff below, appeals an adverse ruling on summary judgment.

Tanner was approximately 35 weeks pregnant and in custody at the Metropolitan Detention Center in Bernalillo County, New Mexico when she went into the final stages of her pregnancy. Over the ensuing thirty hours, commencing with the point at which her water broke, Appellees—employees of a nationwide private medical contractor—ignored and minimized her symptoms, refused to transport her to a hospital, and failed to conduct even a cursory pelvic examination. Only minimal attention was given to her: water, Tylenol, and sanitary pads. After thirty hours of pain and trauma, Tanner gave birth to her son. The child was born with his umbilical cord wrapped around his neck. He was not breathing. He had no pulse.

Tanner initiated an action under 42 U.S.C. § 1983 for the death of her child. On motion for summary judgment brought by the defendants, Timothy McMurray, MD, and Adriana Luna and Taileigh Sanchez, RNs, the district court granted the requested relief on the basis of qualified immunity. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse.

**I**

**A**

At the time the baby was stillborn, Appellees were full-time employees of Correct Care Solutions, LLC (CCS). CCS is a for-profit corporation that contracts with government entities to provide medical care in correctional facilities.[1] One hundred percent of CCS's business operations are government contracts. The overwhelming majority of these are contracts to provide medical care in correctional facilities. In 2016, CCS had contracts with approximately 200 jails in 38 states, exclusive of its contracts with state departments of correction.

In July 2014, Bernalillo County, New Mexico (the "County") issued a request for proposals (RFP) to provide medical care to detainees in the County's Metropolitan Detention Center (MDC). CCS submitted a responsive proposal and, following a competitive bidding process, was selected by the County. A four-year term contract was negotiated and signed. CCS and its employees were defined as

---

[1] In October 2018, CCS merged with Wellpath LLC. It now operates under the name Wellpath. It continues to provide medical care under contract in correctional facilities.

3

independent contractors in the contract, which delegated the provision of all medical services for MDC residents to CCS. Other than mandating that CCS and its employees adhere to local and national policies governing medical care in correctional facilities, the contract limited the County's oversight to the appointment of a "contract monitor" responsible for working "collaboratively" with CCS to "ensure that services delivered meet or exceed" expectations.

Appellant asserts that CCS routinely violated the terms of its contract without consequence. It is alleged that CCS consistently failed to maintain proper levels of staffing under the contract, and that even after the contract was amended to allow it to reduce the staffing levels originally required in the RFP, CCS continued to fail to meet staffing requirements. CCS agreed in a June 1, 2015 contract amendment to provide bi-weekly, onsite OB/GYN clinics at the MDC, but as of October 2016, had failed to provide a single OB/GYN clinic.

Appellee McMurray, the Medical Director at the MDC site, was the "ultimate decision maker" for clinical issues. He was responsible for all decisions related to the care of patients at the MDC. The County was not required to be involved. McMurray had the ultimate authority to refer incarcerated individuals for offsite treatment. Other CCS employees, including Appellees Luna and Sanchez, were given the authority to refer a patient for offsite emergency care.

# B

Shawna Tanner was arrested and booked into the MDC facility on October 4, 2016.[2]  During intake screening, she informed staff that she was pregnant.  Twelve days later, during the morning of October 16, Tanner's water broke.  She first felt wetness and a small amount of mucous discharge, then a large amount of clear fluid "began gushing" from her body.  She also felt discomfort and cramping.  At roughly 7:36 a.m., Tanner informed an MDC staff officer of those events and asked to be seen by medical personnel.  Appellee Luna, a CCS nurse, reported that she was "busy" and did not attend to Tanner's pleas for approximately an hour and a half.  At approximately 9:00 a.m., Luna examined Tanner for five minutes.  Tanner reported that she could feel the baby moving at this time.  During the examination, Luna did not test the discharge for the presence of amniotic fluid, did not otherwise examine Tanner, and did not call McMurray.  Instead, after the brief examination, Luna sent Tanner back to her cell with sanitary pads and instructions to drink water.  Tanner slowly made her way back to her cell, paused multiple times to lean against walls, and complained of significant pain and "pressure down there."

Approximately one hour later, Officer Rebecca Macias called a "code 43" medical emergency.  At that point, Tanner was in continued pain, bleeding, experiencing contractions, and felt like her baby was "crowning."  Macias had attempted to call the medical office before "calling the code 43," but reported that no

---

[2]  We credit Appellant's testimony in instances of disputed fact because she was the nonmovant below.  Tolan v. Cotton, 572 U.S. 650, 651 (2014) (per curiam).

one answered, which Macias characterized as "typical." Ultimately, Luna and an EMT responded to Tanner's cell. Luna observed multiple blood clots in the toilet and a blood-soaked sanitary napkin on top of the trash. Luna dismissed Tanner's concerns, stating, "it is normal to bleed during pregnancy when you're a drug addict," and "we can't help you if you keep lying." Tanner pleaded with Luna to perform a vaginal examination, but Luna refused, declaring "we don't do that." She chose not to call for medical assistance in performing such an evaluation.

When Luna asked Tanner if Tanner could walk to the medical unit, Tanner replied that she was in so much pain that she was unable to do so. Tanner was able to walk to the medical cart at the end of the hallway, but she doubled over in pain and grabbed onto her abdomen on the way. She was escorted by Officer Macias, who reported that Tanner left "a trail along the floor of the hallway" from the fluid discharge that had soaked through Tanner's pants.

Luna's second examination of Tanner lasted six minutes, one minute longer than the first. Luna did not perform a pelvic examination, but she did take Tanner's vital signs and listened to the fetus' heart rate. She performed a Nitrazine test to check for the presence of amniotic fluid, but incorrectly tested a used sanitary pad instead of testing fluid directly from Tanner. Luna then called McMurray to inform him of Tanner's condition. McMurray advised that he would see Tanner the next day. During this examination, Tanner asked to be sent to a hospital. Luna refused and instead transferred Tanner to the "Sheltered Housing Unit" (SHU), a single occupancy cell near the infirmary. Luna did not check on Tanner again for seven

6

hours until near the end of her shift, at which time Tanner was anxious, experiencing continuing discharge, crying, and in pain.

Appellee Sanchez, another CCS nurse, took over for Luna shortly before 6:00 p.m., and Luna informed Sanchez of Tanner's condition at that time. Sanchez saw Tanner twice over the course of her shift. Tanner asked Sanchez to conduct a pelvic exam, but Sanchez refused because it was not "within [her] scope of practice [at the jail]." Sanchez did not call a provider who would be able to perform a pelvic exam. Tanner spent the night alone in the SHU.

McMurray arrived at the jail the next morning and saw Tanner in the SHU. Tanner informed McMurray that she was in pain, that she was experiencing contractions, and that she feared the cause was her child; she asked McMurray to examine her. McMurray refused and said he would see her along with the other pregnant women the next day. In the interim, he cleared Tanner to leave the SHU and return to her housing pod.

After returning to her housing pod, Tanner continued to experience contractions and "excruciating pain." She noticed a large blood clot had passed, and her pants were soaked in blood. She could not feel the baby moving. Tanner was then taken, yet again, to the medical unit. Two nurses attempted to detect the child's heartbeat, but both failed. One of the nurses told McMurray, who was sitting in his office, that Tanner was saturating sanitary pads with blood and that two nurses could not find the baby's heartbeat. Only then, approximately thirty hours into labor, did McMurray authorize a call for an ambulance.

7

When paramedics arrived, they found Tanner in clear pain, laying on a table in the medical unit, appearing to be in labor. Tanner was "obviously having contractions." Several medical personnel were around Tanner when the paramedics arrived. McMurray was standing alone in the back of the room. When it was suggested that it was McMurray's responsibility to deliver the baby, the doctor shook his head in the negative, threw up his hands, and did not move from the corner. Instead, the paramedics delivered Tanner's child. He was born with his umbilical cord wrapped around his neck. There was no pulse. He was not breathing. McMurray remained silent in the back of the room as a paramedic used a bulb syringe to clear the baby's airway. It was too late. The thirty-hour childbirth ordeal was over. The baby was dead.

## C

Tanner sued under § 1983 alleging deliberate indifference in violation of the Eighth and Fourteenth Amendments. The district court granted the motion for summary judgment of the Appellees, concluding that they were eligible to assert qualified immunity and that they were entitled to qualified immunity.

## II

This appeal presents the question of whether employees of a national private corporation providing medical services in a correctional institution can assert qualified immunity. In the past, we have declined to address the issue in cases where the plaintiff overcame qualified immunity even if available. See, e.g., Kellum v. Mares, 657 F. App'x

763, 768 n.3 (10th Cir. 2016) (unpublished). However, we recently allowed a sole practitioner doctor who was engaged part time by a county jail to assert the defense. See Estate of Madison Jody Jensen v. Tubbs, No. 20-4025, — F.3d —, (10th Cir. Mar. 2, 2021). Other circuits that have considered the question presented in this appeal have concluded with near uniformity that corporate medical contractors are not entitled to assert qualified immunity. See Estate of Clark, 865 F.3d 544, 551 (7th Cir. 2017); McCullum v. Tepe, 693 F.3d 696, 704 (6th Cir. 2012); Jensen v. Lane Cty., 222 F.3d 570, 580 (9th Cir. 2000); Hinson v. Edmond, 192 F.3d 1342, 1347 (11th Cir. 1999). But see Perniciaro v. Lea, 901 F.3d 241, 251 (5th Cir. 2018).

In recent years, both state and federal correctional departments have increasingly turned to private corporations to provide medical care in their facilities.[3] As the use of for-profit medical contractors continues to rise, so will qualified immunity be sought by such contractors. Whether they can assert qualified immunity is squarely presented in this appeal. The question has been thoroughly briefed and ably argued. We must answer it. We conclude that neither late 19th century common law nor present-day policy considerations counsel in favor of extending qualified immunity in the manner Appellees

---

[3] Data is limited, but some experts estimate that over half of state and local prisons and jails have contracted with private companies to provide healthcare. See Katie Gottschalk and Rebecca Reingold, The Public Health of Private Prison Healthcare, O'Neill Institute at Georgetown Law (Aug. 27, 2016), https://oneill.law.georgetown.edu/the-public-health-of-private-prison-healthcare/. Additionally, federal spending on outsourced correctional healthcare increased by 24 percent between 2010 and 2014. Off. of the Inspector Gen., U.S. Dep't of Justice, The Federal Bureau of Prisons' Reimbursement Rates for Outside Medical Care, 1 (June 2016), https://oig.justice.gov/reports/2016/e1604.pdf.

seek. We therefore hold that the employees of private corporations providing medical care in correctional facilities under circumstances similar to those presented in this case are not entitled to assert qualified immunity.

**A**

Our analysis is framed by Supreme Court cases that discuss when a private party is eligible to assert qualified immunity. Principal cases are Wyatt v. Cole, 504 U.S. 158 (1992); Richardson v. McKnight, 521 U.S. 399 (1997); and Filarsky v. Delia, 566 U.S. 377 (2012). Each case resolves a narrow question involving private individuals; none directly addresses the issue before us. Richardson comes close— although it does not involve medical contractors, it does involve private prison guards employed by a large for-profit corporation.

In Wyatt, the Court considered "[w]hether private persons, who conspire with state officials to violate constitutional rights, have available the good faith immunity applicable to public officials." 504 U.S. at 168 (quotation omitted). Wyatt acknowledged that § 1983 "creates a species of tort liability that on its face admits no immunities," but noted that the Court had granted government officials a level of immunity if "the tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine." Id. at 164 (quotations omitted). According to the Court, although immunity is "necessary to preserve [the] ability [of government officials] to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service," these

10

considerations "are not transferable to private parties," in part because private parties are not "principally concerned with enhancing the public good." Id. at 167-68. Holding that "the nexus between private parties and the historic purposes of qualified immunity is simply too attenuated," the Court declined to extend qualified immunity to the private parties in Wyatt. Id. at 168.

Richardson addressed "whether prison guards who are employees of a private prison management firm are entitled to qualified immunity from suit by prisoners charging a violation of 42 U.S.C. § 1983," and held "that they are not." 521 U.S. at 401. Richardson involved a § 1983 suit brought by Ronnie Lee McKnight, a Tennessee prisoner, against two prison guards who were employed by a corporation that managed the correctional facility where he was incarcerated. Id. at 402, 409. In considering whether the guards could avail themselves of qualified immunity, the Court first looked for a "firmly rooted" historical "tradition of immunity applicable to privately employed prison guards." Id. at 404 (quotation omitted). Acknowledging that "[g]overnment-employed prison guards may have enjoyed a kind of immunity defense arising out of their status as public employees at common law," it found no correlative immunity for privately employed prison guards. Id. at 405 (emphasis in original). Richardson recognizes that "private contractors were heavily involved in prison management during the 19th century," and found substantial "evidence that the common law provided mistreated prisoners in prison leasing States with remedies against mistreatment by those private lessors." Id.; see also id. at 407

11

("[W]e have found no indication of any more general immunity that might have applied to private individuals working for profit.").

In addressing the policy objectives that underlie qualified immunity, the Richardson court noted that several "critical" differences among public and private prison guards tempered the policy justifications for qualified immunity. Id. at 409. For example, Richardson stated, unwarranted timidity—"the most important special government immunity-producing concern"—is largely ameliorated when the individual seeking immunity works for "a private company subject to competitive market pressures." Id. These pressures "provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance." Id. at 410. The Court explained that "privatization helps to meet the immunity-related need to ensure that talented candidates are not deterred by the threat of damages suits from entering public service." Id. at 411 (quotation omitted). Because private companies often carry liability insurance, there is a reduced degree of "employment-discouraging fear of unwarranted liability" and private companies have significantly more flexibility than government agencies to "offset any increased employee liability risk with higher pay or extra benefits." Id.

Richardson rejected the proposition that because "private prison guards perform the same work as state prison guards, . . . they must require immunity to a similar degree." Id. at 408. Instead, the Court concluded that because "there [were] no special reasons significantly favoring an extension of governmental immunity"

and because a historical tradition of immunity was wanting, qualified immunity was not available to privately employed prison guards. Id. at 412.

Filarsky answers the question of "whether an individual hired by the government to do its work is prohibited from seeking [qualified] immunity, solely because he works for the government on something other than a permanent or full-time basis." 566 U.S. at 380. Steve Filarsky was an attorney with a substantial private practice who specialized in employment law. He was temporarily engaged by the city of Rialto, California on a discrete employment investigation. Filarksy, 566 U.S. at 381. He was sued under § 1983 for his role in the investigation. On appeal from an adverse decision, the Supreme Court held that he was eligible to assert qualified immunity. Throughout the opinion, the Court focuses on the fact that Filarsky was not a full-time employee of the Rialto city government but was instead an attorney with a private practice occasionally hired by the city to assist in employment investigations. The historical analysis explains that around the time of the passage of § 1983, "government was administered by members of society who temporarily or occasionally discharged public functions." Id. at 385 (quotation omitted). The Court identified a common law tradition of providing "immunity for actions taken while engaged in public service on a temporary or occasional basis." Id. at 388-89. Its policy analysis follows a similar theme. Private individuals, especially those with "specialized knowledge or expertise," have the option to select "work that will not expose them to liability for government actions" because the government is not their sole or even primary source of livelihood. Id. at 390. On this

13

basis, the Court held that Filarsky, who occasionally engaged in temporary work with the city government, was entitled to the same immunity as the government officials who hired him.[4] Id. at 393-94.

**B**

We extract from the above cases that availability of qualified immunity to private parties performing governmental functions depends on (1) "the common law as it existed when Congress passed § 1983 in 1871," and (2) the policy reasons the Supreme Court has "given for recognizing immunity under § 1983." Filarsky, 566 U.S. at 384, 389. We interpret this as a disjunctive test: Private individuals are entitled to assert qualified immunity if their claim is "supported by historical practice or based on public policy considerations." Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc., 413 F.3d 1163, 1166 (10th Cir. 2005).

1

Historical analysis of the situation before us favors denial of qualified immunity. No circuit that has considered this issue has uncovered a common law tradition of immunity for full-time private medical staff working under the color of state law. After conducting a thorough review of the case law as it stood in 1871, the

---

[4] We employed nearly identical logic in Estate of Lockett ex rel. Lockett v. Fallin, 841 F.3d 1098 (10th Cir. 2016). In that case, a private doctor was engaged by a prison to administer an execution. Id. at 1105-06. We relied on Filarsky's conclusion that the common law did not distinguish between "permanent, full-time government employees and temporary ones" and allowed the doctor to assert qualified immunity because he "st[ood] in the same position as the attorney in Filarsky." Id. at 1108, 1109 (quotation omitted).

14

Sixth Circuit concluded, "[t]here is little directly applicable case law.  But the precedents that do exist point in one direction:  there was no special immunity for a doctor working for the state."  McCullum, 693 F.3d at 703.[5]  The most persuasive case identified by McCullum is Du Bois v. Decker, 130 N.Y. 325 (1891), in which a city physician was sued for negligence in treating an injured man in the city's alms house.  Immunity was not asserted by the doctor, and it was not discussed by the court.  However, the court did declare that "[t]he fact that he was paid by the city instead of the plaintiff did not relieve him from the duty to exercise ordinary care and skill."  Id. at 332; see also Williams v. Nally, 45 S.W. 874, 874 (Ky. 1898) (physician hired by county justice of the peace liable for malpractice); Landon v. Humphrey, 9 Conn. 209, 216 (1832) (private doctor hired by Connecticut town to provide smallpox vaccinations liable for malpractice).

---

[5] See also Jensen, 222 F.3d at 577 ("[T]he parties have not offered, and we have not found, any definitive common law history of immunity outside of Oregon that would support a finding of qualified immunity here."); Hinson, 192 F.3d at 1345 ("The parties have not been able to point to, and independent research—including a look at the sources cited by the Supreme Court in Richardson—does not reveal, cases which show a common law tradition of immunity from liability for privately employed prison physicians for acts amounting to recklessness or intentional wrongdoing.").  The Fifth Circuit conducted a more circumscribed historical analysis in Perniciaro, in which the court granted qualified immunity to a private physician. That decision was predicated on the doctors in question being "private individuals who work in a public institution and alongside government employees, but who do so as something other than full-time public employees."  Perniciaro, 901 F.3d at 252 (citing Filarsky, 566 U.S. at 383).  Perniciaro involved a claim against a psychiatrist who worked full time for Tulane University as a "professor of clinical psychiatry and neurology" while also maintaining a limited caseload of patients at a state-operated mental health facility, and not a claim against employees of a multi-state corporation organized to provide health care in state and local correctional facilities.  Id. at 247.

Our independent research has uncovered little additional information, but what we have found further suggests a lack of a common law tradition of immunity for private medical professionals working for the state. In Ayers v. Russell, 3 N.Y.S. 338 (N.Y. Gen. Term 1888), the plaintiff had been temporarily committed to an insane asylum and subsequently sued the judge, court recorder, and physicians who played a role in his confinement. The court held the judge and recorder to be immune from suit, but that the physicians were "chargeable with that negligence which attaches to a professional expert who does not use the care and skill which his profession, per se, implies that he will bring to his professional work." Id. at 341; see also id. at 343 (Learned, J. concurring) ("[A]s this demurrer admits that the physicians were negligent, they are liable for their negligence, as they would be for negligence in any other matter of their practice."). A contemporaneous treatise recognized that "[i]t is the universal practice of the state governments in the exercise of their police power to supply proper medical attendance to persons confined in prisons . . . . And a physician may be employed either by the single visit from time to time or by the year." 3 Truman Abbe & Frank H. Bowlby, Wharton and Stille's Medical Jurisprudence § 493 (5th ed. 1905). Though the practice was universal, the rules of negligence applied "without reference to the question by whom the physician was retained," and there is no suggestion that doctors employed by the state enjoyed special immunity from tort liability. Id. § 500.

All available authorities thus point to the historical availability of tort remedies against physicians regardless of whether they were employed by a

16

government entity. Availability of tort remedies against private correctional employees led the Supreme Court to deny qualified immunity in Richardson. 521 U.S. at 405 ("[T]he common law provided mistreated prisoners in prison leasing States with remedies against mistreatment by those private lessors."). Appellees do not cite to any case law to gainsay the conclusion reached by our sibling circuits that similar remedies were historically available to those who suffered mistreatment at the hands of government-employed private medical practitioners. Given our own inability to find any cases to the contrary, we conclude that the common law at the time § 1983 was passed supports holding that qualified immunity is unavailable to Appellees.

2

We thus turn to the policy justifications of "avoid[ing] unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions" of litigation. Filarsky, 566 U.S. at 389-90 (quotation omitted).

Richardson identified the concern about unwarranted timidity as being "the most important special government immunity-producing concern," but found it was substantially ameliorated by "competitive market pressures." 521 U.S. at 409, 410. While these market pressures do not exist for government entities, they bear on a private employer to create "strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance." Id. at 410. Appellees at bar worked for a large corporation operating in a competitive market.

17

Indeed, this market was evidently competitive enough that CCS was replaced as MDC's medical services provider after this incident. As the loss of the county contract demonstrates, CCS had every incentive to ensure that its employees were providing competent medical care. Additionally, CCS's contract with the County defined CCS employees as independent contractors rather than county employees, providing CCS with "freedom to respond to those market pressures through rewards and penalties that operate directly upon its employees." Id.

Concerns of "unwarranted timidity" are also significantly less pressing for medical professionals—who face potential liability both for choosing a course of treatment that is too aggressive and for choosing a course not aggressive enough—than for police officers and prison guards, who rarely face liability for, as an example, not using enough force.

A second policy justification identified by the Court is to "ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service." Wyatt, 504 U.S. at 167. Richardson concluded that "privatization" helps to mitigate this concern because insurance requirements—like those included in CCS's contract with the County—"increase[] the likelihood of employee indemnification and to that extent reduces the employment-discouraging fear of unwarranted liability potential applicants face." 521 U.S. at 411. Because CCS is a private firm, it has the capacity, "unlike a government department, to offset any increased employee liability risk with higher pay or extra benefits." Id.

18

Moreover, a medical professional working for CCS in a state or federal prison may face less risk of civil damages than a medical professional working in private practice because it is more difficult for a plaintiff to prevail on a claim of deliberate indifference to a serious medical need than on a claim for medical malpractice. A deliberate medical indifference claim requires a plaintiff to satisfy two inquiries. First, under the objective inquiry, the harm claimed must be "sufficiently serious to constitute a deprivation of constitutional dimension." Strain v. Regalado, 977 F.3d 984, 989-90 (10th Cir. 2020) (quotation omitted). Second, under the subjective inquiry, the official must have "know[n] and disregard[ed] an excessive risk to inmate health or safety." Id. at 990 (quotation omitted). In contrast, a plaintiff may succeed on a medical malpractice claim against a private practitioner in New Mexico without a showing of knowledge or intent; that plaintiff must only make a straightforward showing of negligence.[6] See Lovelace Med. Ctr. v. Mendez, 111 N.M. 336, 349 (1991). Qualified immunity aside, given that a doctor or nurse working for CCS in a state facility already enjoys more protection from civil damages than do their privately employed counterparts, we doubt that our holding will deter anyone from entering public service.

Finally, although civil rights lawsuits may serve as some distraction for private contractors providing medical care in a jail or prison, "the risk of distraction alone cannot be sufficient grounds for [] immunity." Richardson, 521 U.S. at 411. While

---

[6] At oral argument, counsel for Appellees acknowledged the differing burden of proof, accepting that Appellees' actions "may amount to medical negligence" but asserting that they were not deliberately indifferent.

19

"even routine lawsuits" may cause a distraction, Filarsky, 566 U.S. at 391, that risk is not particularly compelling in this situation. Healthcare professionals in private practice face a constant threat of claims leading to litigation. Facing constitutional tort claims with a higher burden of proof is not any more daunting or distracting than dealing with the medical malpractice claims with which they are familiar.

In sum, neither 19th century common law nor modern policy considerations support allowing private medical professionals who are employees of a contractor that provides healthcare in jails or prisons to avail themselves of qualified immunity.

## C

The district court relied on Filarsky to conclude that Appellees are eligible to assert qualified immunity, dismissing Richardson as "self-consciously narrow" and inapplicable. Tanner v. McMurray, 429 F. Supp. 3d 1047, 1196 (D.N.M. 2019) (quotation omitted). Appellees echo this line of reasoning in their briefs. We disagree with the district court. In our judgment, Filarsky is not contrary to our analysis of this case, and Richardson provides the closest factual analogue.

Applicability of Filarsky to this appeal is quite limited. Filarsky addressed the specific question of whether qualified immunity was available to private individuals who, while under close supervision, completed discrete tasks for the government when the government needed their expertise. See Filarsky, 566 U.S. at 380-81. While Filarsky answered this question in the affirmative, it is not at all clear that the premise applies to Appellees. First, Filarsky evinced special concern that denying attorneys providing part-time services qualified immunity would severely limit the

20

government's ability to meet "particular need[s] for specialized knowledge or expertise." Id. at 390. Because experts often "do not depend on the government for their livelihood, they have freedom to select other work—work that will not expose them to liability for government actions." Id. Therefore, "the most talented candidates will decline public engagements" if they are subjected to extra liability that they do not face in their private practice. Id. That concern is inapplicable here. Employment attorneys like Filarsky are not habitually forced to defend themselves from allegations that they violated a person's rights under the Fourth and Fourteenth Amendments, but, in contrast, medical malpractice suits are a common concern for all medical professionals. While true that medical practitioners do not face deliberate indifference claims in their private practice, we explained above how the constitutional nature of deliberate indifference claims serves only to increase Appellant's burden of proof and provides Appellees greater protection from liability than enjoyed by their private counterparts.

Second, Filarsky acted under the supervision of the Rialto Fire Chief and worked in concert with the Chief and other Rialto Fire Department officials to investigate the involved employee. Id. at 380-82. In contrast, although Appellees worked in the same facility as County employees, they worked largely free of County supervision. Their work was contained in a discrete and independent unit and they were not carrying out government functions in tandem with government employees. Also unlike Filarsky, Appellees were not engaged by the County on an ad hoc basis

21

to "assist" the County "in carrying out its work."[7]  Id. at 393.  Instead, Appellees were full-time employees of a private, for-profit corporation organized specifically to compete in the marketplace of providing comprehensive medical care in correctional facilities.

Finally, Filarsky expressed concern about withholding qualified immunity from private individuals who are "principally concerned with enhancing the public good."  Id. at 392 (quotation omitted).  Far from being "principally concerned" with the public good, CCS is "using the mechanisms of government to achieve [its] own ends."  Id.  According to one recent report, CCS's parent company expects to achieve $1,500,000,000 in annual revenue through its contracts in jails and prisons.[8]  Clearly, CCS, a for-profit corporation acting to maximize shareholder value pursuant to its fiduciary duty, is not the noble part-time public servant envisioned by Filarsky.

Endorsing the district court's conclusion that Appellees are entitled to qualified immunity under Filarsky simply because they worked for the government through a contractor would establish a de facto functional test for qualified immunity. Any individual who is working full-time for the government through a contractor would be entitled to the same protections as if they were directly working for the

---

[7] This also distinguishes Appellees from the wharfmasters, notaries, trustees of a public institution, school board members, and "private individuals appointed by [a] sheriff to serve as judges of an election" that Filarsky reviewed in its historical analysis.  566 U.S. at 388-89.

[8] See Marsha McLeod, The Private Option, The Atlantic (Sept. 12, 2019), https://www.theatlantic.com/politics/archive/2019/09/private-equitys-grip-on-jail-health-care/597871/.

22

government.  This simple functional test could have appeal, but it was unequivocally rejected by Richardson.[9]  Richardson observes that while the Court occasionally applies a functional test to determine whether a public official is entitled to absolute or qualified immunity, it has never held "that the mere performance of a governmental function could make the difference between unlimited § 1983 liability and qualified immunity, especially for a private person who performs a job without government supervision or direction."  Richardson, 521 U.S. at 408-09 (citation omitted).  The Court explains that a functional approach would be unworkable in practice "since, in many areas, government and private industry may engage in fundamentally similar activities, ranging from electricity production, to waste disposal, to even mail delivery."  Id. at 409.

Filarsky took care to acknowledge that Richardson remained good law for situations involving "a private firm, systematically organized to assume a major lengthy administrative task . . . with limited direct supervision by the government, undertaking that task for profit and potentially in competition with other firms."  566 U.S. at 393 (quoting Richardson, 521 U.S. at 413).  Filarsky was eligible to assert

---

[9] Indeed, the district court's broad reading of Filarsky would necessarily overrule Richardson.  The district court collapsed the nuanced inquiry in Filarsky to interpret its holding as "qualified immunity's purposes are equally implicated whether the individual facing suit is a state actor working full-time or an individual working for the state on some other basis."  Tanner, 429 F. Supp. 3d at 1197.  This directly contradicts Richardson, which listed several "critical" differences between full-time state employees and employees of a private corporation that contracts with the state.  See Richardson, 521 U.S. at 409.  Because Filarsky was explicit in not overruling Richardson, see 566 U.S. at 392, its holding cannot bear the weight the district court places upon it.

23

qualified immunity because "nothing of the sort [was] involved" in his case.  Id.  By comparison, Richardson provides a close factual analogue to this appeal.

The factors in Richardson that counseled against allowing the defense of qualified immunity for guards working at a private prison are all present in this case. As were the prison guards in Richardson, Appellees are full time employees of a large private corporation that is "systematically organized" to provide contract healthcare services in government facilities.  Richardson's explanation of how the pressures of a competitive market ameliorate the qualified immunity-justifying concern of unwarranted timidity by providing "strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful or 'nonarduous' employee job performance"[10] applies unerringly to the facts of this appeal.  521 U.S. at 410.

---

[10] Appellees' counsel's characterization of this aspect of Richardson's analysis is misleading.  They assert that, while Richardson identified competitive market pressures as a "critical" difference between government and private prison systems that counseled against allowing private prison guards to assert qualified immunity, it then cabined that conclusion by

> explain[ing] . . . that in the context of a government-run prison, where the employees operate in a "different system" subject to restrictive institutional rules and regulations that "limit the incentives or the ability of individual departments or supervisors flexibly to reward, or to punish, individual employees," special immunity is necessary to prevent "overly timid . . . employee job performance."

Resp. Br. at 32 (quoting Richardson, 521 U.S. at 410-11) (emphasis and alterations in original).  Of course, this excerpt of Richardson is describing how government supervisors and government departments lack flexibility to punish and reward government employees and drawing a specific contrast to the flexibility enjoyed by private employers like CCS to punish and reward as necessary—all of which led Richardson to conclude that there was no special immunity needed "to encourage [the] vigorous performance" of private employees.  521 U.S. at 411.

24

First, the firm in <u>Richardson</u> was "a large, multistate . . . firm . . . , systematically organized to perform a major administrative task for profit." <u>Id.</u> at 409. Similarly, CCS is a nationwide company that is systematically organized to profit from providing medical care in detention facilities. Its sole business is to contract with government entities to provide medical care in correctional facilities. Its business is extensive: In 2016, CCS operated in roughly 200 local and county jails in 38 states.

Second, as did the prison guards in <u>Richardson</u>, Appellees perform their tasks "independently," with only minimal "ongoing direct state supervision." <u>Id.</u> The district court minimized Appellees' independence, emphasizing instead that they performed their duties pursuant to a contract with the County. <u>See</u> <u>Tanner</u>, 429 F. Supp. 3d at 1199. The mere existence of a contract does not establish close supervision, and even a cursory review of the record reveals that Appellees operated with near-complete discretion in providing medical care for detainees, as was compelled by the contract. Appellees' designated Rule 30(b)(6) witness testified that McMurray was "the ultimate decision-maker when it comes to clinical issues" at the jail. "All of the decisions for care of patients on-site rest with" him. The contract itself eschews close supervision by the county. The RFP, incorporated into the contract, states that CCS "shall provide on-site primary health care services" in accordance with generally accepted standards. Even in instances where the County was to be financially responsible for medical care, e.g. off-site hospitalizations, CCS personnel yet had the responsibility to use their independent discretion to "identify

25

patients in need of such care and to facilitate, prioritize and coordinate these services."

The district court's analysis of whether the County closely supervised Appellees, relevant under <u>Filarsky</u>, is a nonstarter.  Under the district court's reasoning, there was a contract between the parties, QED there was close supervision.  But this is circuitous.  The contract does not provide for supervision of medical staff by the County.  The County does not have the expertise to supervise a medical doctor or registered nurses.  Quite to the contrary of the district court's reliance on the existence of the contract as evidence of close supervision, CCS seemed not to care much about its contractual agreements to provide proper medical staffing.  Most assuredly, the *raison d'être* of the existence of the contract was to ensure that medical professionals provided the medical care necessary to incarcerated individuals.  The County had no independent means of providing this medical care, and it negotiated a contract that did not obligate it to closely supervise the manner in which CCS did so.

Neither the district court in its judgment, nor Appellees in their briefs, tell us who in the County it would have supervising the medical professionals. Of course, the proposition that a jailor could supervise the delivery of medical services by licensed professionals is risible on its face, and a faceless government entity, as such, could even much less do so.[11]

---

[11] Supervision of medical professionals would necessarily involve the practice of medicine and is prohibited.  In New Mexico, practice of medicine without a

Finally, CCS and the private firm in <u>Richardson</u> were required to hold insurance to cover their employees. <u>Richardson</u>, 521 U.S. at 410. <u>Richardson</u> and the case presently before us both involved contracts with limited terms. This creates "pressure from potentially competing firms" who could seek to supplant the current service provider. <u>Id.</u> Driving home the point, CCS was replaced by the County at the end of its contract, and it was presumably compelled to consider the business consequences of denying a woman in labor access to minimally acceptable medical treatment.

**D**

Neither historical justifications of special government immunity nor modern policy considerations support the extension of a qualified immunity defense to Appellees—private medical professionals employed full-time by a multi-state, for-profit corporation systematically organized to provide medical care in correctional facilities. Both Appellees' arguments on appeal and the district court's decision stretch the holding of <u>Filarsky</u> well beyond its breaking point. Their faulty reasoning would functionally overturn <u>Richardson</u>.

---

license is a felony. N.M. Stat. Ann. § 61-6-20. An opinion of the New Mexico Attorney General permits the corporate practice of medicine, "unless . . . it exercises lay control of medical judgment." NMAG Opinion NO. 87-39 (July 30, 1987). Similarly, American Medical Association guidelines deem it unethical for medical doctors to enter into a contract to provide health care services unless the physician may "appropriately exercise professional judgment." AMA Code of Medical Ethics Opinion 11.2.3. Similar principles would apply to registered nurses in the exercise of their profession.

27

## III

We **REVERSE** the district court's determination that Appellees are eligible to assert a defense based on qualified immunity. We **VACATE** the district court's grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.