# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 12, 2020

Lyle W. Cayce
Clerk

No. 17-41234

_____

RONALD LEE CONVERSE, Individually and as next friend of Chad Ernest Lee Silvis, Deceased,

      Plaintiff - Appellant

SARA MONROE, as next friend B. S., a minor,

      Intervenor - Appellant

v.

CITY OF KEMAH, TEXAS; OFFICER RUBEN KIMBALL; ANNA MARIE WHELAN; DANIEL KIRBY; GREG RIKARD; MARCUS WAY; OFFICER JAMES MELTON,

      Defendants - Appellees

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SARA MONROE, as Next Friend of B.S., a Minor,

      Plaintiff - Appellant

v.

CITY OF KEMAH POLICE DEPARTMENT; OFFICER JAMES MELTON; OFFICER RUBEN KIMBALL; OFFICER MARCUS WAY; ANNA MARIE WHELAN, DISPATCHER; OFFICER DANIEL KIRBY; CHIEF GREG RIKARD,

      Defendants - Appellees

No. 17-41234

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, DENNIS, and WILLETT, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

Family members of Chad Ernest Lee Silvis (Plaintiffs) sued officers of the City of Kemah Police Department (Defendants)[1] after Silvis committed suicide in a jail cell by hanging himself with a blanket that one of the officers gave him. Plaintiffs alleged, inter alia, that the officers were deliberately indifferent to Silva's serious medical needs in violation of the Fourteenth Amendment. After limited discovery, the district court dismissed Plaintiffs' claims based on qualified immunity. Because Plaintiffs' complaint contains sufficient factual allegations to state a claim for relief, we REVERSE and REMAND.

---

[1] Ronald Lee Converse, the administrator of Silvis's estate, first filed suit against the City of Kemah Police Department and Officer James Melton in state probate court on March 25, 2015, asserting claims of negligence, gross negligence, wrongful death, and violation of 42 U.S.C. § 1983. The City and Officer Melton removed the case to federal court, Converse filed an amended complaint adding Officers Ruben Kimball, Marcus Way, and Daniel Kirby; Dispatcher Ann Marie Whelan; and Chief Greg Rikard as defendants. He also added Eighth and Fourteenth Amendment claims. Sarah Monroe, the mother of Silvis's child, moved to intervene in the case on February 16, 2016, and the district court granted Monroe's motion and consolidated Converse's and Monroe's cases on July 20, 2016.

The district court dismissed Plaintiffs' Eighth Amendment and Texas Tort Claims Act claims against all the defendants, along with Plaintiffs' Fourteenth Amendment claims against the City and Chief Rikard. The district court also dismissed the claims against Officer Kirby, finding that Plaintiffs' complaint did not include Officer Kirby in events that led to Silvis' suicide. Plaintiffs do not appeal any of these rulings. Therefore, this opinion will address only the § 1983 claims against Officers Kimball, Way, Melton, and Dispatcher Whelan based on the Fourteenth Amendment.

No. 17-41234

## I.

On April 11, 2014, around 12:20 a.m., 26-year-old Chad Silvis threatened to commit suicide by jumping off a bridge in Kemah, Texas. A passerby alerted Officer Marcus Way, and Officer Way broadcasted on his police radio that there was a possible "jumper." Officers James Melton and Ruben Kimball, along with Dispatcher Anna Marie Whelan, heard the broadcast. After confirming that Silvis was the possible jumper, Officer Way notified Dispatcher Whelan to dispatch more units to the bridge. Officers Kimball and Melton met Officer Way at the bridge, and, after some conversation with Silvis, Officer Melton was able to forcefully pull Silvis off the bridge railing. The officers arrested Silvis, and Officer Kimball drove Silvis to the Kemah jail.

Officers Kimball and Way were present when Silvis was booked in the jail. Officer Kimball prepared the cell and gave Silvis a blanket, but before Silvis was allowed to enter the cell, Officer Way told Officer Kimball to take Silvis's shoes. After Silvis was booked, Officers Kimball, Way, Melton, and Whelan all observed Silvis in his cell with the blanket. While in his cell, Silvis was yelling, banging his hands against the cell door, and stating that he "should have jumped." During Silvis's outbursts, Officer Melton visited Silvis in his cell at least twice and asked him to refrain from further outbursts and stated that "if he could be quiet for 30 minutes," then Officer Melton would provide Silvis the cigarette that he was requesting. None of the officers removed the blanket from Silvis's cell. At around 1:44 a.m., Silvis used the blanket to hang himself from the top bunk of the bed in his cell. The officers did not discover his body until forty-five minutes later.

Plaintiffs brought suit under 42 U.S.C. § 1983, claiming, inter alia, that individual Officers Kimball, Melton, and Way, and Dispatcher Whelan were deliberately indifferent to Silvis's serious medical risks in violation of the Fourteenth Amendment. Defendants moved to dismiss the complaint under

3

No. 17-41234

Rule 12(b)(6), arguing that they were not deliberately indifferent and were entitled to qualified immunity. The district court denied the motion and ordered limited discovery for "further clarification of the facts" of qualified immunity. At a hearing, the district court explained that the purpose of the limited discovery was to allow Plaintiffs to attempt "to be able to plead a cause of action that survives the assertion of qualified immunity." Plaintiffs filed an amended complaint based on the additional discovery, and Defendants filed another motion to dismiss. The district court granted Defendants' motion to dismiss based on their defense of qualified immunity. Plaintiffs timely appealed.

## II.

We review de novo the district court's order on a motion to dismiss for failure to state a claim under Rule 12(b)(6). *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

"Qualified immunity protects officers from suit unless their conduct violates a clearly established constitutional right." *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003). After a defendant asserts the defense of qualified immunity, "[a] plaintiff seeking to overcome qualified immunity must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). While "[t]he plaintiff bears the burden of

No. 17-41234

negating qualified immunity" after the defendant asserts the defense, *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010), we "accept all well-pleaded facts as true [and] view[] them in the light most favorable to the plaintiff." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999).

## III.

On appeal, Plaintiffs argue that they have pleaded sufficient facts that allow the court to draw the reasonable inference that Defendants—Officers Way, Melton, and Kimball, and Dispatcher Whelan—are not entitled to qualified immunity because they were subjectively aware that Silvis was at a significant risk of suicide and responded unreasonably to that risk by failing to remove the blanket from Silvis's cell, in violation of the Fourteenth Amendment.  We agree.

### A. Prong 1: Violation of a Statutory or Constitutional Right

To overcome the officials' qualified immunity defense, Plaintiffs must first demonstrate that each official violated Silvis's statutory or constitutional right. *See Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000). We have repeatedly held that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide.  *See, e.g.*, *id.*; *Hare v. City of Corinth* (*Hare II*), 74 F.3d 633, 639 (5th Cir. 1996).  And it is well-settled law that jail officials violate this right if "they had gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Hare II*, 74 F.3d at 650; *Jacobs*, 228 F.3d at 393.  Here, Plaintiffs allege that Dispatcher Whelan and Officers Melton, Way, and Kimball each had subjective awareness that Silvis was at substantial risk of suicide and that they were each deliberately indifferent to this risk.  Accepting these allegations (discussed in greater detail below) as true, as we must, "[P]laintiffs have cleared the first hurdle in defeating the [Defendants'] qualified immunity defense." *Jacobs*, 228 F.3d at 393.

No. 17-41234

## B. Prong 2: Violation of Clearly Established Law

The second part of the qualified immunity analysis requires us to determine "whether the [D]efendants' conduct was objectively unreasonable in light of clearly established law at the time of [Silvis's] suicide." *Id.* Since at least 1989, it has been clearly established that officials may be held liable for their acts or omissions that result in a detainee's suicide if they "had subjective knowledge of a substantial risk of harm to a pretrial detainee but responded with deliberate indifference to that risk." *Id.* at 393-94 (quoting *Hare II*, 74 F.3d at 650); *see also Flores v. County of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997) ("A detainee's right to adequate protection from known suicidal tendencies was clearly established when Flores committed suicide in January 1990."). The sometimes confusing relationship between these two standards—qualified immunity's "objective reasonableness" standard and the Fourteenth Amendment's "subjective deliberate indifference" standard—has been distilled as follows: "[W]e are to determine whether, in light of the facts as viewed in the light most favorable to the plaintiffs, the conduct of the individual defendants was objectively unreasonable when applied against the deliberate indifference standard." *Jacobs*, 228 F.3d at 394.

A prison official will not be held liable if he merely "should have known" of a risk; instead, to satisfy this high standard, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).[2] An official shows a deliberate indifference

---

[2] *Farmer v. Brennan* analyzed deliberate indifference as applied to federal prisoners, which is proscribed by the Eighth Amendment. *See* 511 U.S. at 832-37; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("[D]eliberate indifference to serious medical needs of prisoners [is] proscribed by the Eighth Amendment."). We have held that the State owes the same duty to pretrial detainees under the Fourteenth Amendment as it owes prisoners under the Eighth

6

No. 17-41234

to that risk "by failing to take reasonable measures to abate it." *Hare II*, 74 F.3d at 648. We apply these principles to assess the conduct of each defendant in turn.

### 1. Dispatcher Whelan

Dispatcher Whelan received the call that Silvis was on the bridge and ready to jump, was present when Silvis was brought into custody and assisted the officers when Silvis arrived at the station, heard Silvis say that he would jump tomorrow when he got out of jail, and could hear Silvis banging on his cell and yelling for medical help. These facts are sufficient to demonstrate that Dispatcher Whelan had actual knowledge that Silvis was suicidal and still wanted to kill himself. Therefore, Plaintiffs have "plead[ed] specific facts that . . . allow the court to draw the reasonable inference that the defendant" had subjective knowledge that Silvis was at a substantial risk of committing suicide. *McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2017); *Hyatt v. Thomas*, 843 F.3d 172, 178-79 (5th Cir. 2016); *Jacobs*, 228 F.3d at 394;[3] *see also Linicomn v. Hill*, 902 F.3d 529, 533 (5th Cir. 2018) (explaining that when deciding a motion to dismiss, the court must "construe the complaint in the light most favorable to the plaintiff").

---

Amendment—that is, to provide them "with basic human needs, including medical care and protection from harm, during their confinement." *Hare II*, 74 F.3d at 639, 650.

[3] We note that *Hyatt v. Thomas* and *Jacobs v. West Feliciana Sheriff's Department* were decided at the summary judgment phase. We have criticized defendants for arguing that cases dismissed on summary judgment supported dismissal of their cases at the pleadings stage. *See Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 629 n.8 (5th Cir. 2018); *Drake v. City of Haltom City*, 106 F. App'x 897, 900 (5th Cir. 2004). We employ the inverse principle here—we rely on cases that survived summary judgment to illustrate that this case passes the lower threshold at the pleading stage. Moreover, we rely on only the factual similarities in *Hyatt* and *Jacobs* to aid in considering Plaintiffs' claims, which does not, of course, alter Plaintiffs' burden at the pleading stage to simply allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

No. 17-41234

Dispatcher Whelan's subjective awareness of the risk is, of course, not the end of our inquiry. We next evaluate whether Plaintiffs have sufficiently pleaded that Dispatcher Whelan deliberately disregarded this risk. As the Supreme Court explained in *Farmer*, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." 511 U.S. at 844.

Dispatcher Whelan, as do all of the Defendants, argues that she escapes liability because she did not subjectively *intend* to harm Silvis or to allow Silvis to harm himself. All of the Defendants claim that they could not be deliberately indifferent because they did not want Silvis to die, evidenced by the fact that they rescued Silvis from jumping off of a bridge before bringing him to the jail. This misconstrues the deliberate indifference inquiry. Deliberate indifference requires that the officers knew of the substantial *risk* that Silvis would die or seriously injure himself—they did not have to know that Silvis *actually would* die, and certainly did not have to *intend* or *want* him to die. *See Farmer*, 511 U.S. at 835; *Hare II*, 74 F.3d at 648. The Supreme Court has been explicit that deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835; *id.* at 839-40 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard . . . and we adopt it as the test for 'deliberate indifference.'").

Here, Plaintiffs have alleged that all four Defendants: (1) "were taught at the academy and field training not to give suicidal inmates blankets and to monitor suicidal inmates frequently"; (2) "were given written policies by the City of Kemah not to give suicidal inmates blankets and to monitor suicidal inmates frequently"; (3) "were aware of several media reports of inmates dying

8

of suicides using bedding in jails"; and (4) "were aware jail suicide was the leading cause of death in Texas jails and that bedding hanging was the most frequent method of suicide." And though Dispatcher Whelan was not the one to give Silvis the blanket, Plaintiffs allege that Dispatcher Whelan observed Silvis in his cell with the blanket, knowing that the blanket could be a tool for committing suicide, yet did not remove the blanket from the cell or take actions to monitor Silvis.

In a case closely analogous to this one, *Jacobs*, we held that an officer was not entitled to summary judgment on qualified immunity grounds, even though it was not the officer's decision to provide the detainee with a blanket, because he observed the detainee lying on the bunk when she had the sheet,[4] knew that suicidal detainees should not be provided with loose bedding yet did not take the bedding away, and failed to check on the detainee as frequently as he was supposed to. 228 F.3d at 397-98. "Given [the officer's] . . . disregard for precautions he knew should be taken," we concluded that a reasonable jury could conclude that he was deliberately indifferent to the detainee's risk of harm. *Id.* at 398.

The only apparent difference between this case and *Jacobs* is that, in *Jacobs*, another detainee had previously committed suicide in that same cell under similar circumstances, yet officers continued to house suicidal inmates in that cell without removing the cell's "tie off points"[5] and even though the cell had blind spots. *Id.* at 395. But this distinction speaks only to the *degree*, not

---

[4] Though another officer had ordered that the detainee be given a blanket, unknown personnel supplied the detainee with a sheet, which she ultimately used to hang herself. Because any loose bedding—whether it be a sheet or a blanket—provides a means for suicidal detainees, this fact was immaterial to our analysis. *See Jacobs*, 228 F.3d at 391, 398.

[5] As the name suggests, tie-off points are places to tie a ligature for the purpose of hanging. *See* CHRISTINE TARTARO, SUICIDE AND SELF-HARM IN PRISONS AND JAILS 58 (2d ed. 2019) (explaining how and why inmates most often commit suicide with loose bedding).

the *occurrence*, of unreasonable behavior.  We have never held, and we will not now suggest, that multiple suicides must occur in the same cell before a jail official is required to take preventative measures.  The proper inquiry, then, is *whether* the jail guards had the subjective knowledge that the bedding posed a substantial risk of suicide, not *how* the guards obtained that knowledge.  *See id.* at 394.  Here, Plaintiffs have alleged that: (1) Dispatcher Whelan had observed media reports concerning inmates who had committed suicide by hanging themselves with their blankets and had been trained not to give suicidal inmates loose bedding for this exact reason; and (2) the cell visibly contained a tie-off point on the top part of the bunk bed.  Just as the officer in *Jacobs*,[6] Dispatcher Whelan knew that Silvis was at a substantial risk of committing suicide and had a means of doing so with the loose bedding she knew he should not have been given, yet she "fail[ed] to take reasonable measures to abate" the risk, demonstrating deliberate indifference.  *Hare II*, 74 F.3d at 648.

### 2. Officer Melton

Officer Melton pulled Silvis off the bridge, interacted with Silvis several times after he was placed in jail, and heard Silvis banging on his cell and yelling that his wrist hurt, that he should have jumped, and that he wanted a nurse.  Based on these facts, a jury could reasonably find that Officer Melton

---

[6] In *Jacobs*, there was a third officer who we found *was* entitled to qualified immunity. Though that officer failed to perform regular checks on the detainee, he had only been on the job for six months and had been following the direct orders of a superior officer—who had twenty years' experience and was more familiar with the suicide risks—when he placed the detainee in that particular cell and allowed her to have a blanket and towel.  Accordingly, we determined that "[i]n light of his more limited knowledge, and the fact that the orders he received from his two superiors were not facially outrageous, [the officer] acted reasonably in following them" and was entitled to qualified immunity.  *Jacobs*, 228 F.3d at 398.  Here, there is no suggestion that any of the Defendants lacked the experience or training to have fully appreciated the risks posed by loose bedding when given to a suicidal inmate.  Moreover, there is no suggestion that any of the Defendants lacked the autonomy to remove the loose bedding from the cell or otherwise take actions to protect Silvis from the risk of harm.

also had subjective knowledge that Silvis was at risk of committing suicide. *See Hyatt*, 843 F.3d at 178.

In addition to having all of the training and knowledge that Dispatcher Whelan had concerning inmates committing suicide with loose bedding and witnessing Silvis in his cell with the blanket he should not have had, Officer Melton also failed to intervene in Silvis's suicide because he was streaming television shows instead of monitoring the video of Silvis's cell. Again, *Jacobs* informs of the clearly established law concerning objectively reasonable, or unreasonable (as the case may be), behavior. In *Jacobs*, we took special notice of the fact that officers allowed more than forty-five minutes to pass between checking on the inmate they knew to be suicidal, allowing her enough time to use her loose bedding to commit suicide. *Jacobs*, 228 F.3d at 391 ("What is clear is that as many as 45 minutes elapsed from the time a deputy last checked on Jacobs to the time she was discovered hanging from the light fixture in the detox cell."). Here, accepting the Plaintiffs' facts as true, Officer Melton knew that Silvis was at a substantial risk of committing suicide, observed that Silvis had been issued a blanket he wasn't supposed to have, failed to remove that blanket, and failed to monitor Silvis as he was supposed to. Officer Melton was not even expected to physically approach Silvis's cell; he was just asked to move his eyes from one television screen to another. Yet forty-five minutes passed between Silvis's death and officers discovering his body. Plaintiffs have plausibly alleged that, by failing to take simple and reasonable precautions, Officer Melton displayed deliberate indifference to the risk of harm to Silvis.

### 3. Officer Way

Officer Way was present when Silvis was on the bridge, instructed Officer Kimball to remove Silvis's shoes before locking his cell, and heard Silvis banging on his cell and yelling that his wrist hurt, that he should have jumped, and that he wanted a nurse. Again, these facts are sufficient to demonstrate

the officer's subjective knowledge that Silvis was at a substantial risk of committing suicide. *See Hyatt*, 843 F.3d at 178 (concluding that official "was subjectively aware of a substantial risk that [detainee] would attempt to commit suicide" where official knew about recent suicide attempt, was informed by another that detainee was suicidal, and abstained from issuing detainee certain items due to his history of suicide attempts).

Plaintiffs have satisfied the threshold for alleging that Officer Way was deliberately indifferent to Silvis's risk of committing suicide for the same reasons as Dispatcher Whelan and Officer Melton. He knew Silvis was suicidal; he knew suicidal detainees should not be given loose bedding because they can use the bedding to harm themselves; he escorted Silvis into the cell with the blanket but did not take it away; and he failed to regularly check on Silvis. Based on these facts, Plaintiffs have satisfied their burden. *See Jacobs*, 228 F.3d at 397-98.

Though it may be tempting to suggest that Officer Way's behavior was not unreasonable because he at least directed Officer Kimball to remove Silvis's shoes before locking him in the cell (removing the danger posed by shoelaces), we have previously held that taking some reasonable precautions does not mean the officer, on the whole, behaved reasonably. *See id.* at 395-96. In *Jacobs*, we observed that one officer "did not completely ignore [the detainee's] suicidal condition, and in fact instituted some preventative measures." *Id.* at 395. "However," we held, "those measures [were not] enough to mitigate his errors." *Id.* And, as was the case here, the inadequacies of placing the detainee in a cell with tie-off points "became even more inadequate" when the officer locked the detainee in the cell with loose bedding. *Id.* at 396. On the whole, Plaintiffs have alleged sufficient facts to demonstrate that Officer Way's behavior "was objectively unreasonable in light of his duty not to be deliberately indifferent." *Id.*

No. 17-41234

### 4. Officer Kimball

Officer Kimball was present when Silvis was on the bridge, heard Silvis say he should have jumped and "Let's do it again tomorrow," removed Silvis's shoes before locking the cell, and heard Silvis banging on his cell and yelling that his hand hurt, that he should have jumped, and that he wanted a nurse. As with the other three defendants, Plaintiffs have alleged sufficient facts to demonstrate that Officer Kimball was subjectively aware of the risk of suicide Silvis faced. *See Hyatt*, 843 F.3d at 178.

Officer Kimball, per Plaintiffs' allegations, was the one who prepared Silvis's cell and gave him a blanket, despite his knowledge and training regarding suicidal detainees. This situation is on all fours with *Jacobs* where we declined to grant an officer qualified immunity at the summary judgment stage because he knew the detainee had attempted suicide at least once before, regarded the detainee as being at risk for suicide at all times of her detention, and yet still provided her with loose bedding. 228 F.3d at 396. Unlike in cases where we have found that the officer was not deliberately indifferent, Silvis never indicated that his suicidal ideation had subsided, *see Flores*, 124 F.3d at 738-39, nor did Officer Kimball have reason to believe Silvis would not be able to use the blanket to commit suicide, *see Hare v. City of Corinth* (*Hare III*), 135 F.3d 320, 329 (5th Cir. 1998). Here, all of Officer Kimball's knowledge, training, and experience of Silvis indicated that Silvis was at risk of suicide and could use loose bedding to make that risk a reality.[7] Yet, Officer Kimball

---

[7] Defendants argue that Officer Kimball did not have knowledge of this risk because Officer Kimball concluded that Silvis was "not serious" about committing suicide. We disagree. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. A jury could infer from Officer Kimball's actions, like removing Silvis's shoes, that he had the requisite knowledge that Silvis was at a serious risk of suicide. *See Hyatt*, 843 F.3d at 178 (despite detainee's statement that he was not presently considering suicide and officer's statement that he did not consider

provided him with a blanket. Accordingly, Plaintiffs have plausibly alleged that Officer Kimball acted with deliberate indifference toward Silvis's substantial risk of suicide.

\* \* \*

At this stage, we do not determine what actually is or is not true; we only ask whether Plaintiffs' plausible allegations state a claim. Here, Plaintiffs allege that Defendants knew through multiple sources—their academy and field training, the City's written policies, and media reports—that bedding posed a substantial risk to suicidal detainees. If Plaintiffs can offer proof to substantiate these allegations (which they do not have to do yet at this stage), they will meet their burden of demonstrating that the Defendants were objectively unreasonable in light of their duty to not act with deliberate indifference. *See Jacobs*, 228 F.3d at 395-96; *cf. Hyatt*, 843 F.3d at 176, 178-79 (finding that officer responded reasonably to a known substantial risk of suicide where she "withheld . . . the most obvious means for self harm"—a thin sheet).

Because Plaintiffs' allegations plausibly state a claim for relief, the district court erred in granting the motion to dismiss.[8] The judgment of the

---

detainee to be a suicide risk, jury could draw the inference that officer was subjectively aware of the risk of harm based on his taking precautions like declining to issue items typically given to detainees and instructing other officers to keep an eye out for suspicious behavior).

[8] Though not the basis of our ruling, we note that the district court seems to have confused our procedure regarding limited discovery in qualified immunity cases. *See Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012) ("[T]his court has established a careful procedure under which a district court may defer its qualified immunity ruling if further factual development is necessary to ascertain the availability of that defense."). Here, the district court initially "den[ied] the Defendants' Rule 12(b)(6) motion on the issue of the qualified immunity," explained that it was "unable to rule on the qualified immunity defense . . . without further clarification of the facts," and ordered limited discovery. Despite Defendants' suggestion that the fact issues that remained after limited discovery should be resolved on a motion for summary judgment, the court directed Plaintiffs to file an amended complaint and Defendants to file a motion to dismiss. The court explained its understanding that Fifth Circuit caselaw allowed the limited discovery so that plaintiffs could sufficiently

No. 17-41234

district court is therefore REVERSED and the case REMANDED for further proceedings consistent with this opinion.

---

plead their case and "get . . . past 12(b)(6), if you can," and therefore a motion for summary judgment was not appropriate after limited discovery. A motion for summary judgment is, however, perfectly appropriate after limited discovery. *See Schultea v. Wood*, 47 F.3d 1427, 1433-34 (5th Cir. 1995) (en banc) (noting that after allowing limited discovery, "the court can again determine whether the case can proceed and consider any motions for summary judgment under Rule 56"); *Griffin v. Edwards*, 116 F.3d 479 (5th Cir. 1997) (affirming the denial of a motion to dismiss "without prejudice to the rights of the public defendants to move for summary judgment on the grounds of qualified immunity at a later date, after such limited discovery as the district court may deem necessary to determine whether a genuine issue exists as to the illegality of the public defendants' conduct").