# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 26, 2021

Lyle W. Cayce
Clerk

No. 20-50282

KATHY R. SANCHEZ, *individually and as dependent administrator of, and on behalf of*, THE ESTATE OF ELI GAUNA, JR. and ELI GAUNA, JR.'S HEIRS-AT-LAW,

*Plaintiff—Appellant*,

*versus*

NATALEE G. OLIVER,

*Defendant—Appellee.*

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:19-CV-221

Before JONES, CLEMENT, and GRAVES, *Circuit Judges*.

EDITH BROWN CLEMENT, *Circuit Judge*:

Eli Gauna, Jr., took his own life while being held in the Bell County jail as a pretrial detainee. His mother, Kathy Sanchez, sued—among others— licensed clinical social worker Natalee Oliver, the mental health professional who evaluated Gauna and took him off suicide watch. The district court granted summary judgment for Oliver, holding that she was entitled to qualified immunity and had not acted with deliberate indifference to Gauna's serious medical needs. Because Oliver, as an employee of a private

organization systematically organized to perform a major administrative task, is not entitled to qualified immunity, and Sanchez has provided sufficient evidence regarding what Oliver knew about Gauna's suicide risk to raise a genuine dispute of material fact over whether Oliver was deliberately indifferent to Gauna's medical needs, we REVERSE and REMAND.

## I. Facts and Proceedings

Gauna was arrested on December 30, 2017, and taken to the Bell County jail. At intake, he was assessed as a suicide risk based on answers to a screening questionnaire, was placed on 15-minute checks, and was scheduled to be evaluated by a mental health professional. Later that day, Gauna met with Oliver for evaluation. Oliver was an employee of Correctional Healthcare Companies, LLC ("CHC"), which contracted with Bell County to provide healthcare services, including mental healthcare, to inmates, juveniles, and pretrial detainees in the County's custody.

Gauna asked to be placed in the infirmary, but Oliver instead took him off suicide watch and placed him among the general population. She advised him to continue taking his medication, to stay active, and to inform staff if his mood declined. She also recommended mandatory follow up meetings with mental health staff. Two days later, Gauna committed suicide by hanging.

Sanchez sued, both individually and on behalf of Gauna's estate, alleging causes of action against Oliver, CHC, and Bell County under 42 U.S.C. § 1983 for violating Gauna's well-established constitutional right to be protected from a known risk of suicide. *See, e.g.*, *Converse v. City of Kemah*, 961 F.3d 771, 775 (5th Cir. 2020) ("We have repeatedly held that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide.").

Oliver moved for summary judgment, claiming qualified immunity, and arguing that there was insufficient evidence that she had acted with

No. 20-50282

deliberate indifference towards Gauna. Sanchez argued that Oliver, as an employee of a private, for-profit service provider, was not entitled to assert the defense of qualified immunity. The magistrate judge recommended finding that Oliver was entitled to qualified immunity, had not been deliberately indifferent, had not acted unreasonably (relative to the deliberate indifference standard), and was entitled to summary judgment. The district court adopted the magistrate's report and recommendation, and granted summary judgment for Oliver. Sanchez successfully moved to designate the order a final judgment under Rule 54(b) and timely appealed.

## II. Standard of Review

This court reviews a grant of summary judgment de novo, applying the same standard as the district court. *See Hyatt v. Thomas*, 843 F.3d 172, 176 (5th Cir. 2016). A court shall grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is material if it "might affect the outcome of the suit under the governing law." *Hyatt*, 843 F.3d at 177 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In evaluating a motion for summary judgment, a court must "construe 'all facts and inferences in the light most favorable to the nonmoving party.'" *Romero v. City of Grapevine*, 888 F.3d 170, 175 (5th Cir. 2018) (quoting *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010)).

## III. Discussion

"To state a claim under § 1983, a plaintiff must allege a violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). It has been clearly established in this Circuit since at least 1989 that "pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide,"

and "it is well-settled law that jail officials violate this right if 'they [have] actual knowledge of the substantial risk of suicide and respond[ ] with deliberate indifference.'" *Converse*, 961 F.3d at 775 (quoting *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996) (*Hare II*)).

Here, there is no question that Oliver, as a medical professional treating a pretrial detainee on behalf of a governmental entity, was acting under color of state law for purposes of § 1983. *See West*, 487 U.S. at 54. As a private actor, Oliver may be liable for acting under color of state law under § 1983, but "it does not necessarily follow that [she] may assert qualified immunity." *Perniciaro v. Lea*, 901 F.3d 241, 251 (5th Cir. 2018); *see also Brewer v. Hayne*, 860 F.3d 819, 823 (5th Cir. 2017) ("A defendant may act under color of state law for the purposes of § 1983 without receiving the related protections of qualified immunity.").

## A.

Whether private actors may assert qualified immunity depends on "(1) principles of tort immunities and defenses applicable at common law around the time of § 1983's enactment in 1871 and (2) the purposes served by granting immunity." *Perniciaro*, 901 F.3d at 251 (citing *Filarsky v. Delia*, 566 U.S. 377, 383–84 (2012)). The purposes of qualified immunity identified by the Supreme Court are "(1) preventing unwarranted timidity in the exercise of official duties; (2) ensuring that highly skilled and qualified candidates are not deterred from public service by the threat of liability; and (3) protecting public employees—and their work—from all of the distraction that litigation entails." *Id.* at 253 (citing *Richardson v. McKnight*, 521 U.S. 399, 407–12 (1997), and *Filarsky*, 566 U.S. at 389–90). Of these, preventing unwarranted timidity is most important. *Richardson*, 521 U.S. at 409.

In holding that Oliver was entitled to assert the defense of qualified immunity, the district court relied heavily on this court's ruling in *Perniciaro*

that two private mental health providers employed by the state through Tulane University were entitled to qualified immunity. However, the *Perniciaro* court took pains to emphasize that Tulane University "is not 'systematically organized' to perform the 'major administrative task' of providing mental-health care at state facilities." 901 F.3d at 254 (quoting *Richardson*, 521 U.S. at 409).

By contrast, Oliver's employer, CHC, is—according to its marketing materials—a major corporation "in the business of administering correctional health care services." CHC derives well over a billion dollars annually from its contracts in jails and prisons. *Tanner v. McMurray*, 989 F.3d 860, 871 (10th Cir. 2021). In other words, Oliver's employer *is* "systematically organized to perform the major administrative task of providing mental-health care at state facilities." *Perniciaro*, 801 F.3d at 254 (cleaned up). Our sister circuits unanimously agree that employees of such entities—including, specifically, CHC in two cases—are not entitled to assert qualified immunity. *See Tanner*, 989 F.3d at 874 (Correct Care Solutions, LLC ("CCS"), a for-profit successor entity to CHC)[1]; *Estate of Clark v. Walker*, 865 F.3d 544, 550–51 (7th Cir. 2017) (CHC); *McCullum v. Tepe*, 693 F.3d 696, 704 (6th Cir. 2012) (Community Behavioral Health, a large non-profit entity); *Jensen v. Lane Cnty.*, 222 F.3d 570, 578–79 (9th Cir. 2000) (Psychiatric Associates, "a privately organized group of psychiatrists"); *Hinson v. Edmond*, 192 F.3d 1342, 1347 (11th Cir. 1999) (Wexford Health Sources, a for-profit company). After considering the historical tradition of immunity at common law around the time § 1983 was

---

[1] CHC, formerly CCS, is now known as "Wellpath." A Wellpath executive explained: "Wellpath was formerly known as Correct Care Solutions, LLC, which was formerly known as Correctional Healthcare Companies, LLC." Accordingly, we treat references to Wellpath, CCS, and CHC as referring to the same entity.

enacted and the policy considerations underlying qualified immunity, we agree with our sister circuits that Oliver—as an employee of a large firm systematically organized to perform the major administrative task of providing mental healthcare at state facilities—is categorically ineligible for qualified immunity.

(1)

The district court held that the common law tradition of immunity prong supported qualified immunity, but offered no further analysis beyond noting that a public counterpart to Oliver would be entitled to assert qualified immunity. This may be understandable, as this court also declined, in *Perniciaro*, to engage in the in-depth historical analysis that the Supreme Court applied in *Filarsky* and *Richardson*. However, the *Perniciaro* court made clear that the facts of that case were closely analogous to *Filarsky*, which facilitated a less verbose analysis of the historical basis for immunity at common law. *See* 901 F.3d at 251–52. To clarify: the question is not whether a modern public counterpart would be entitled to immunity, but, rather, whether general principles of tort immunities and defenses under "the common law as it existed when Congress passed § 1983 in 1871" support the availability of qualified immunity to a private party. *Filarsky*, 566 U.S. at 384.

In *Filarsky*, the Court conducted an in-depth historical survey of the common law in the late nineteenth century, and found that "examples of individuals receiving immunity for actions taken while engaged in public service on a temporary or occasional basis are as varied as the reach of government itself." *Id*. at 388–89. However, the *Filarsky* Court expressly distinguished the case of an individual retained, as an individual, to perform discrete government tasks from the "private firm, systematically organized to assume a major lengthy administrative task . . . with limited direct supervision by the government, undertak[ing] that task for profit and

potentially in competition with other firms" that was at issue in *Richardson*. *Id*. at 593 (quoting *Richardson*, 521 U.S. at 413).

In that light, the *Perniciaro* court's invocation of *Filarsky* should not lead this court to conclude that we may shirk our responsibility to conduct a robust historical inquiry. Rather, *Perniciaro* is better understood as having recognized that the psychiatrists in that case were more closely comparable to the independent attorney retained by the government in *Filarsky* than the employees of a large firm at issue in *Richardson*, and, therefore, that they were entitled to qualified immunity protections similar to those afforded their public-sector counterparts. *See Perniciaro*, 901 F.3d at 251–52 ("Here, as in *Filarsky*, Drs. Thompson and Nicholl are private individuals who work in a public institution and alongside government employees, but who do so as something other than full-time public employees." (internal citation omitted)).

We must therefore conduct an independent inquiry into whether history reveals a "'firmly rooted' tradition of immunity applicable to privately employed" medical professionals. *See Richardson*, 521 U.S. at 404. We begin by noting that all of our sister circuits to have considered the issue have found no compelling history of immunity for private medical providers in a correctional setting. *See Tanner*, 989 F.3d at 867–68 ("No circuit that has considered this issue has uncovered a common law tradition of immunity for full-time private medical staff working under the color of state law."); *Estate of Clark*, 865 F.3d at 550–51; *McCullum*, 693 F.3d at 703 ("[T]he precedents that do exist point in one direction: there was no special immunity for a doctor working for the state."); *Jensen*, 222 F.3d at 577 ("We have been unable to uncover even a suggestion that Oregon has a 'firmly rooted tradition' of immunity . . . ."); *Hinson*, 192 F.3d at 1345 ("Under common law, no 'firmly rooted' tradition of immunity applicable to privately

employed prison physicians exists under circumstances such as these.").
Oliver also points us to no such history or tradition.

On the other hand, the Supreme Court has hinted in dicta that such a
history might exist. *See Richardson*, 521 U.S. at 407 ("Apparently the law *did*
provide a kind of immunity for certain private defendants, such as doctors or
lawyers who performed services at the behest of the sovereign."). The
historical treatise the *Richardson* Court cited indicates that both private and
public physicians enjoyed at least some level of immunity for negligence,
although they could be sued or even criminally prosecuted for acts amounting
to recklessness. *See* Joel P. Bishop, Commentaries on Non-
Contract Law § 708 (1889) (indicating that, under English and
American common law, a physician was probably "not liable for the
consequences of simple negligence or want of skill").

We agree with our sister circuits that the key to untangling whether
there is a tradition of immunity applicable to private citizens in Oliver's
position is the nature of the claims against her. As discussed below, regardless
of the availability of qualified immunity, to state a § 1983 claim for a violation
of Fourteenth Amendment rights, a plaintiff must show that a medical
provider acted with deliberate indifference to a serious medical need, which
the Supreme Court has compared to a recklessness standard. *See Farmer v.
Brennan*, 511 U.S. 825, 839–40 (1994). Our sister circuits have noted that
there appears to have been no tradition of immunity for a doctor who acted
recklessly. *See, e.g.*, *Hinson*, 192 F.3d at 1345–46 ("For acts amounting to
recklessness or intentional wrongdoing, . . . immunity did not exist . . . .").
Since a constitutional claim under § 1983 effectively requires reckless
conduct, this history counsels against finding a common law tradition of
immunity. We find that there is no sufficient historical tradition of immunity
at common law to support making the qualified immunity defense available

No. 20-50282

to a mental healthcare provider employed by a large, for-profit company contracted by a government entity to provide care in a correctional setting.

(2)

We turn next to the three purposes served by qualified immunity to determine whether immunity is necessary to "protect[ ] 'government's ability to perform its traditional functions.'" *Richardson*, 521 U.S. at 408 (quoting *Wyatt v. Cole*, 504 U.S. 158, 167 (1992)). We again concur with the unanimous opinion of our sister circuits that policy considerations do not favor extending qualified immunity to employees of a large entity systematically organized to perform a major administrative task like Oliver.

(i)

The first, and most important, purpose of qualified immunity is avoiding unwarranted timidity by those carrying out the government's work. Where a private employee works for a firm that is "systematically organized to perform a major administrative task for profit," market forces are likely to "provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance." *Richardson*, 521 U.S. at 409–10. In *Richardson*, the Court noted that the private firm in that case had a three-year contract (with renewal periods), so "its performance [was] disciplined . . . by pressure from potentially competing firms who can try to take its place." *Id*. at 410. The Court also noted that the firm was required to buy insurance to compensate victims of civil rights torts and operated with "relatively less ongoing direct state supervision." *Id*. at 409–10.

Similarly, the contract between CHC and Bell County provided for a three-year term, with two, one-year renewal periods. CHC operates nationally within a competitive marketplace, subject to the perpetual threat of replacement by a more efficient firm if they are unable or unwilling to

perform their contracted-for tasks. Like the firm in *Richardson*, CHC was required to maintain substantial insurance coverage: Medical Malpractice / Professional Liability Insurance coverage "not less than $1,000,000 per occurrence and $3,000,000 in the aggregate," plus the same amount of "Comprehensive General Liability" coverage. In its contract proposal, CHC also touted its full-time risk management and legal defense team—including "an in-house legal team of attorneys and paralegals" ready to "aggressively address each claim or lawsuit"—which should mitigate the type of liability risk that might provoke timidity. As in *Richardson*, "ordinary marketplace pressures are present here" to effectively diffuse the risk of timidity. *Id.* at 409.

> We also note, echoing our colleagues on the Tenth Circuit, that
>> [c]oncerns of 'unwarranted timidity' are [ ] significantly less pressing for medical professionals—who face potential liability both for choosing a course of treatment that is too aggressive and for choosing a course not aggressive enough—than for police officers and prison guards, who rarely face liability for, as an example, not using enough force.

*Tanner*, 989 F.3d at 869. This court recognized that mental health professionals may nonetheless be improperly influenced by the risk of litigation when their employer's "primary function is not providing health-care services, whether by contract or directly," and the marketplace pressures applicable to them (as university professors) were not "fine-tuned to preventing overly timid care." *Perniciaro*, 901 F.3d at 254. Here, however, the market pressures are precisely the opposite—CHC's primary function is providing healthcare services. Unlike the Tulane professors in *Perniciaro*, Oliver does not point us to extensive conflicting duties that could dilute

CHC's ability to evaluate her performance based on the mental healthcare services she provides.

Finally, the district court relied on contract language indicating that "Bell County retained authority to set the 'policies and procedures related to healthcare [or] mental healthcare.'" There is, however, no evidence that this contractual language in any meaningful way distinguishes this case from *Richardson*—or is anything other than a standard requirement that a service provider perform in accordance with the client's wishes. What the record *does* reveal is substantial evidence that Oliver was overseen by CHC, and CHC took the lead in developing policy. CHC developed and maintained the County's "healthcare Policies and Procedures Manual," the County could not fire or discipline CHC employees—they had to submit a written notice of dissatisfaction for adjudication by CHC, and Oliver testified that the decision to take Gauna off suicide watch was *solely* at her own discretion—in fact, County employees lacked the authority to do so.

The most important purpose of qualified immunity—preventing overly timid performance—strongly indicates that it should not be extended to an employee in Oliver's situation.

(ii)

The second purpose of qualified immunity is to "ensur[e] that talented candidates are not deterred from public service." *Filarsky*, 566 U.S. at 389–90. The district court noted only that the record did not indicate the extent to which Oliver's pay was responsive to the risk of liability and that she was closely supervised by Bell County. As discussed above, the district court substantially overstates the level of control Bell County exerted over CHC employees. The district court also misapprehends the applicability of *Perniciaro*. Unlike the Tulane professors in *Perniciaro*, there is no evidence that Oliver's job included a broad range of duties other than the provision of

mental healthcare. Oliver was hired as a "Mental Health Professional," implying that she was evaluated on the basis of her performance in providing mental healthcare. Her primary job purpose is described as "provid[ing] clinical services . . . to inmates [and] mental health consultation and training to facility staff."

More to the point, the district court opinion appears to misapprehend the nature of this aspect of the qualified immunity test. As the Eleventh Circuit noted, the issue is not so much whether Oliver's pay actually *was* higher than a comparable government employee's pay would have been, but, rather, that tools are *available* to a private company to recruit talented candidates. *See Hinson*, 192 F.3d at 1347 ("Employee indemnification, increased benefits and higher pay are all tools at the disposal of a private company like Wexford; and they can be used to attract suitable employees.").

CHC had substantial latitude to ensure that Oliver (and other employees like her) were adequately motivated. Her hiring letter indicates that Oliver was strictly an "at will" employee, meaning that she could be discharged without cause. Her wages, conditions of employment, and availability of benefits were determined by CHC, and the record provides no indication that CHC couldn't increase her compensation or other incentives, such as by offering to upgrade Oliver from part-time to full-time employment with benefits. To the contrary, the record reveals Oliver enjoyed precisely such a part-time to full-time upgrade.

As noted above, CHC was contractually required to procure insurance, and was free to offer insurance and/or indemnity to employees. This "increases the likelihood of employee indemnification and to that extent reduces the employment-discouraging fear of unwarranted liability." *Richardson*, 521 U.S. at 411.

No. 20-50282

Finally, the record directly contradicts the notion that subjecting CHC to liability would impede its capacity to attract qualified talent. As of its December 2013 proposal to Bell County, CHC was a massive organization that "serve[d] more than 240 correctional facilities throughout the United States" and "support[ed] the provision of medical services to more than 70,000 inmates daily." Its successor, Wellpath, boasts of serving 394 facilities and 130,000 inmates and juveniles. To support this enormous undertaking, CHC "employ[s] more than 2,750 employees and contractors." In other words, CHC specifically markets its ability to attract qualified people to public service as an aspect of its sales pitch to government clients. Further, CHC and its employees have known for some time now that they could be subject to liability without the benefit of qualified immunity. Five circuit courts have said as much, *see, e.g.*, *McCullum*, 693 F.3d at 704 (6th Cir.); *Jensen*, 222 F.3d at 578–79 (9th Cir.); *Hinson*, 192 F.3d at 1347 (11th Cir.). In fact, two of these courts specified CHC itself. *See Tanner*, 989 F.3d at 874 (10th Cir.)[2]; *Estate of Clark v. Walker*, 865 F.3d at 550–51 (7th Cir.). Yet CHC still attracts qualified employees. Denying Oliver recourse to qualified immunity will not deter qualified individuals from public service.

(iii)

The final purpose of qualified immunity is to "protect[ ] public employees from frequent lawsuits that might distract them from their official duties." *Perniciaro*, 901 F.3d at 254. This is likely the least weighty purpose of qualified immunity; the Supreme Court has noted that "the risk of

---

[2] Given its recency, one might consider that possible effects for CHC in the Tenth Circuit following *Tanner* may not yet have fully materialized, but over five years ago a district court within that Circuit also specifically found that CHC employees were categorically ineligible for qualified immunity. *See Atchison v. Corr. Healthcare Cos., Inc.*, No. CV 15-00039 WJ/SCY, 2016 WL 10587985, at *6 (D.N.M. Mar. 8, 2016). CHC and its employees have been on notice that qualified immunity may not be available.

'distraction' alone cannot be sufficient grounds for an immunity." *Richardson*, 521 U.S. at 411. In *Perniciaro*, this court recognized that "the distraction of a lawsuit against a private individual will 'often also affect public employees with whom they work by embroiling those employees in litigation.'" 901 F.3d at 254 (quoting *Filarsky*, 566 U.S. at 391). Here, Oliver testified that she had close relationships with jail employees, at least some of whom will likely be required to testify or otherwise become involved in this litigation.

However, as noted above, CHC maintains full-time risk management and legal teams to mitigate the impact of litigation. Its contract with the County also provides for CHC to supply personnel on a man-hour (rather than individual employee) basis. This permits flexibility for CHC to replace employees distracted by litigation with comparable professionals during those hours when the sued employees are distracted. In other words, CHC employees are only distracted by litigation in their private capacity; the contract with Bell County permits CHC to ensure that public needs are met (even if it requires CHC to provide a substitute employee).

As in *Richardson*, it appears Bell County contemplated at least some level of distraction by litigation when it contracted with CHC. *See* 521 U.S. at 411–12. The contract provides that CHC will indemnify the County for liability caused by CHC or "its agents, employees or independent contractors." In return, the County promised to notify CHC of lawsuits and to "fully cooperate in the defense of such claim[s]."

Thus, although permitting lawsuits against CHC personnel is likely to have the secondary effect of distracting public employees with whom they work, the harmful impact is mitigated by CHC's legal team, the structure of its contract with the County, and the fact that the County "can be understood to have anticipated a certain amount of distraction." *Id.* at 412. This purpose

favors Oliver's eligibility for qualified immunity, but only mildly. It is also the least important of the three purposes and is not "enough virtually by itself to justify providing an immunity." *Id.*

Because we can find no tradition of immunity at common law to support Oliver's claim to qualified immunity, and the purposes of qualified immunity, on balance, weigh against extending immunity, we hold that Oliver, as an employee of a large firm "systematically organized to perform a major administrative task for profit," is categorically ineligible to assert the defense of qualified immunity. *Id.* at 409.

## B.

This court "may affirm the district court's judgment on any grounds supported by the record." *Stewart v. Capital Safety USA*, 867 F.3d 517, 520 (5th Cir. 2017) (cleaned up). So, we find it prudent to consider the district court's finding that Oliver was not deliberately indifferent and, therefore, not liable under § 1983 for violating Gauna's Fourteenth Amendment rights, since that finding could independently dispose of Sanchez's Fourteenth Amendment claims. We hold that the district court erred.

There is a confusing relationship between the "objective reasonableness" standard applicable to qualified immunity and the "subjective deliberate indifference" standard applicable to a Fourteenth Amendment claim. *See Converse*, 961 F.3d at 775. Sanchez asserted a § 1983 claim, and "a state jail official's constitutional liability to pretrial detainees for episodic acts or omissions should be measured by a standard of subjective deliberate indifference . . . ." *Hare II*, 74 F.3d at 643. "[T]o satisfy this high standard, a prison official 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Converse*, 961 F.3d at 775 (quoting *Farmer*, 511 U.S. at 837). What a prison official subjectively knew "is a question of

fact subject to demonstration in the usual ways." *Farmer*, 511 U.S. at 842. On the other hand, "[w]hether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury," *Brown v. Bolin*, 500 F. App'x 309, 312 (5th Cir. 2012) (unpublished).

"Deliberate indifference is an extremely high standard to meet." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001)). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference. . . ." *Id*. However, if an official has subjective knowledge that a pretrial detainee is a substantial suicide risk, the "official shows a deliberate indifference to that risk 'by failing to take reasonable measures to abate it.'" *Converse*, 961 F.3d at 776 (quoting *Hare II*, 74 F.3d at 648).

Here, the key factual dispute is whether Oliver subjectively knew that Gauna was at a substantial risk of attempting suicide. We have held in the past that giving obvious ligatures to a detainee who is known to be at risk of suicide constitutes deliberate indifference. *See, e.g.*, *Converse*, 961 F.3d at 778–79 (finding deliberate indifference where some steps were taken to prevent suicide, including removing the detainee's shoelaces and placing him in a cell with video monitoring, but the detainee was nonetheless given a blanket and left in a cell with obvious tie-off points).

On the other hand, we do not demand perfection. For example, in *Hyatt*, the defendant officer removed the blanket (the most obvious potential ligature) from the detainee's cell and "placed him under continuous, if ultimately imperfect, video surveillance." 843 F.3d at 179. The officer's failure to thoroughly inspect the decedent's cell for "any other potential ligatures," including the plastic garbage bag he eventually used to hang himself, "was perhaps negligent," but not deliberate indifference. *Id*.

Here, however, Gauna was placed in general population, with ready access to blankets, other potential ligatures, and tie-off points, along with whatever other means of self-harm might be present in what appears to be the complete absence of suicide watch or other meaningful suicide precautions. If Oliver knew that Gauna was a suicide risk, then the evidence Sanchez has presented supports the inference that Oliver's decision to take Gauna off suicide watch and place him in general population was, if anything, even more reckless than the officers' conduct in *Converse*. Thus, the question is whether Sanchez has presented evidence from which a reasonable jury could infer that Oliver knew Gauna was at risk of suicide and ignored the risk.

The district court, in finding that Oliver had merely misdiagnosed Gauna, indulged numerous inferences in Oliver's favor, concluding that her ultimate diagnosis—that Gauna was not a substantial suicide risk because he professed to have no suicidal intent "at the moment"—reliably indicates a genuine failure to perceive the obvious risk that Gauna was suicidal. To the contrary, Sanchez presented extensive evidence from which one could reasonably infer that Oliver was aware of the risk and chose to ignore it.

Oliver was aware that at least one other Bell County staff member had determined that Gauna was a serious suicide risk, as her evaluation was to determine whether to *keep* Gauna on suicide watch. Gauna filled out a screening form that asked whether he was "thinking of killing or injuring [him]self today;" he responded, "Yes Maybe not sure." He indicated that he felt depressed "all the time" and had attempted suicide by hanging "a couple months ago." Oliver's evaluation notes indicate that Gauna shared with her his history of *seven* prior suicide attempts. He told her he had active suicidal ideation "all the time," that it "always crosses [his] mind," and "there is always a plan" to carry it out. Oliver acknowledged later that she had discussed Gauna's history of auditory hallucinations, including an incident five days prior to their interview (Christmas Day) when Gauna had

suffered auditory hallucinations so severe that he had physically harmed himself.

The district court credited Oliver with having performed a reliable diagnostic test, the Columbia-Suicide Severity Rating Scale ("C-SSRS"), to reach the diagnosis that he was not a suicide risk, even though she allegedly did so orally rather than in writing.[3] However, during her deposition, Oliver was asked to describe the C-SSRS test that she had administered. She was unable to properly recite a single question, nor could she even remember that there were six questions, testifying, when asked how many questions there were (whether there were four), that there "might be five." The district court did not see this as evidence that Oliver did not have the C-SSRS questions competently memorized two years prior to her deposition, but—indulging inferences in favor of the nonmovant—this is at least evidence that Oliver was not able to administer the C-SSRS from memory.

Sanchez's expert also produced a publicly available copy of the C-SSRS developed specifically for the correctional setting. It clearly states that any report of prior suicide attempts within the prior three months should lead to officials taking "immediate suicide precautions." Every copy of the test produced by either party similarly indicates that the information Gauna is known to have provided Oliver should have raised red flags.

Gauna was already on suicide watch, Oliver had sole authority to take him off, and he was asking to be placed in the infirmary for further observation. Given that, had Oliver simply declined to perform the test in any meaningful way, then she likely deliberately ignored Gauna's obvious needs.

---

[3] Sanchez's expert witness, Dr. Arthur Joyce, indicated that use of a standard C-SSRS form, rather than recitation of questions from memory, is necessary to accurately conduct the evaluation and that Oliver therefore could not be considered to have done so.

If, on the other hand, she administered the test and the results told her that Gauna needed to remain on suicide watch, and she put him in general population anyway, that also likely constitutes deliberate indifference. Whether Oliver's inability to remember the C-SSRS and failure to complete a written version indicates that she effectively failed to administer a test, or whether the extensive evidence that a proper administration should have provided obvious indications that Gauna was suicidal, there is adequate evidence of deliberate indifference to submit the question to a jury. *See Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

This case is readily distinguished from this court's *Domino* opinion. 239 F.3d 752. In *Domino*, the allegation was that the risk of suicide was sufficiently obvious that the doctor *should have* perceived it, not that he actually had perceived it. *Id*. at 754 ("Ms. Domino claims Reddy *should have* recognized that Domino was suicidal . . . ." (emphasis added)); *see also* Brief of Plaintiff-Appellee at 22–25, *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752 (5th Cir. 2001) (No. 99-41486), 2000 WL 33992278 (arguing that the defendant's poor diagnostic procedure "rose to deliberate indifference" without arguing that defendant actually knew Domino was suicidal).

More importantly, in *Domino*, there was a long-standing doctor–patient relationship lasting for over a year. 239 F.3d at 753–54. The doctor had a clear reason for not believing that Domino was suicidal: Domino had asked for sleeping pills and, when denied them, told the doctor "I can be suicidal." *Id*. at 753. The doctor concluded that "Domino's statement was an attempt to achieve 'secondary gain,' such as sedatives or a single cell," and that he was not actually a suicide risk. *Id*. The doctor "presented evidence that Domino had been a difficult, often uncooperative patient." *Id*. at 756. The *Domino* court concluded that the doctor "did not believe the

threat was genuine. [His] diagnosis was wrong. But . . . an incorrect diagnosis does not amount to deliberate indifference." *Id*.

Here, plaintiffs have alleged that Oliver actually knew Gauna was suicidal, but declined to keep him on suicidal watch regardless. There was no pre-existing provider–patient relationship. Oliver had no reason to believe that Gauna's expressed desire for protection in the infirmary from his own suicidal tendencies was for secondary gain or in any other way insincere. To the contrary, her notes described Gauna as "cooperative," albeit "very, very depressed." Gauna told Oliver that he had active suicidal ideation, and experienced it "all the time," that "it always crosses my mind," and that "there is always a plan" for how he would commit suicide. Oliver had access to ample evidence that Gauna was genuinely suicidal, and has offered no evidence other than a five-word diagnostic note ("no intent 'at the moment'") to indicate that she did not actually perceive this risk. Nonetheless, she made the decision—that was solely within her purview to make—that Gauna be taken off suicide watch and placed into the general population, where he would have access to tie-off points and ligatures, including the bedsheets with which he eventually hanged himself. Sanchez has presented enough evidence from which a reasonable jury could conclude that Oliver was aware of facts from which she could draw the inference that Gauna was suicidal, and that she actually did draw that inference but responded with deliberate indifference, to avoid summary judgment on her § 1983 claim under the Fourteenth Amendment.

## IV. Conclusion

As an employee of a private firm systematically organized to perform the major administrative task of delivering healthcare services to inmates, detainees, and juveniles, Oliver is categorically ineligible to claim qualified immunity. Further, Sanchez has put forth enough evidence for a reasonable

No. 20-50282

trier of fact to infer that Oliver knew Gauna was at serious risk of suicide, and chose to ignore the risk. We REVERSE and REMAND.